SMITH, ADMINISTRATRIX C.T.A. OF THE ESTATE OF ADA M. EPPLE, ET AL. *v.* SILVER SPRING-WHEATON NURSING HOME, INC.

[No. 336, September Term, 1965.]

*Decided June 22, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and BARNES, JJ.

*Victor L. Crawford,* with whom was *Henry F. Lerch* on the brief, for appellants.

*William H. Clarke* for appellee.

MARBURY, J., delivered the opinion of the Court.

Suit was instituted in the Circuit Court for Montgomery County by Mrs. Emilie Smith, as administratrix c.t.a. of the estate of her deceased mother, Mrs. Ada M. Epple, to recover for injuries sustained by Mrs. Epple, as the result of a fall which took place when the latter was a patient in a nursing home

owned and operated by the defendant, Silver Spring-Wheaton Nursing Home, Inc. The plaintiff's declaration alleged that the Nursing Home had negligently breached its contractual duty to provide for adequate supervision of its patient and that such inadequate supervision was the proximate cause of Mrs. Epple's fall. In May 1965, a jury trial was held, Judge James H. Pugh presiding, and at the conclusion of the plaintiff's case the trial judge granted the defendant's motion for a directed verdict on the ground that the evidence was legally insufficient to support a finding of primary negligence. Judgment was entered for the defendant for costs.

On this appeal the plaintiff-appellant strenuously contends that she had presented enough evidence to go to the jury on the issue of primary negligence because, she asserts, in substance, that there was legally sufficient evidence to show: (1) that the defendant had employed as its agent Jane Lochte to work as a practical nurse on Mrs. Epple's case, and that this nurse was of unsound mind at the time of the hiring, and (2) that Mrs. Lochte's unsound or deranged mental condition caused her to take certain irrational and imprudent actions in caring for the patient which proximately caused her injuries. For the purposes of this appeal, we will assume without deciding or without setting forth the facts relevant thereto, that Jane Lochte was the agent of the defendant.

The administratrix, Mrs. Emilie Smith, testified that one week prior to being placed in the defendant's nursing home her mother had suddenly developed a respiratory infection and had become quite ill, while staying at her (Mrs. Smith's) home. Their family doctor suggested that Mrs. Epple be given antibiotics and that she be placed in an oxygen tent. This was done and toward the end of the week Mrs. Epple was taken out of the tent, and was able to walk, with aid, to the bathroom. Despite the improvement, the family decided to put Mrs. Epple in the defendant's nursing home because the Christmas holiday season was approaching and they thought that she would need quieter surroundings than the Smith residence provided. Mrs. Epple entered the nursing home on December 18, 1961, and at approximately 6:30 on the morning of December 20, 1961, Mrs. Epple fell and broke her hip soon after having been

escorted to the bathroom by Jane Lochte, a practical nurse, who had been on duty with Mrs. Epple for only one night previous to the accident.

Jane Lochte was, at the time of the accident, fifty-two years of age, and had in her youth been a student nurse.[1] Her training lasted for a period of one year and eight months, but before completing the entire course, she decided to terminate her studies in order to marry. In 1949 Mrs. Lochte became a patient in the Springfield State (mental) Hospital. Her first stay at the hospital lasted only two months but in June of 1953 she was readmitted. In January 1960 Mrs. Lochte was released from the hospital as "improved." She was, subsequent to the date of the accident involved in this suit, readmitted to Springfield, where she remained a patient until the trial of the instant case. During all of the time Mrs. Lochte was at the hospital she was diagnosed as having a "schizophrenic reaction, paranoid type." A medical doctor with three years residency in psychiatry testified as to the nature of this mental illness. He stated: "By schizophrenia we mean a major illness, usually involving some degree of loss of reality testing. By paranoid we mean a person who is unduly suspicious, has false beliefs; usually of a persecutory nature, somebody is doing something to her, things of this sort."

At the trial the plaintiff elected to put on as her witness, the practical nurse, Jane Lochte. Mrs. Lochte testified that on December 18, 1961, she had received a phone call from one of the defendant's agents and was advised that Mrs. Epple was in need of a night duty practical nurse. She accepted the case and reported for duty that very evening. The first night was apparently uneventful, but Mrs. Lochte recalled that her patient was restrained in bed (by means of her ankles having been tied to the bed) and that she had given her a bedpan which was used by her about three times during the course of the night. As to the second night (December 19-20, 1961) Mrs. Lochte stated that "I might be wrong—I didn't report until about eleven o'clock, until it was time for me to sit my eight hours," and

---

1. The record does not reveal whether she was studying to become a registered nurse, or training to become a more efficient practical nurse.

that when she reported Mrs. Emilie Smith was there. According to Mrs. Lochte, Mrs. Smith specifically asked her to get Mrs. Epple out of bed at 6:30 the next morning and take her to the bathroom. Mrs. Lochte recalled that when she arrived on duty for the second night the restraints were already on Mrs. Epple, but that the patient was still very restless and kept trying to get out of bed. She also testified that "before she left Mrs. Smith, I believe, raised the sides of the bed."

Another practical nurse, Nan Merritt, who was a regular employee of the corporate defendant, had a slightly different version of when the restraints were put on Mrs. Epple. She testified that at about 1:00 a.m. in the morning of December 20, 1961, while walking by Mrs. Epple's room, she noticed that Mrs. Epple was getting restless and at either Mrs. Lochte's or her suggestion (she could not recall which) restraints were then put on the patient.

In regard to the happening of the accident, Mrs. Lochte stated that at about 6:30 on the morning of December 20, 1961, she took the restraints off Mrs. Epple, put her arm around the patient's waist and the patient draped her arm around Mrs. Lochte's shoulder, and in this manner she walked Mrs. Epple to the commode. After the patient had urinated, Mrs. Lochte testified that "I * * * took her back and sat her in the chair," [2] and then "I forgot I had [not] flushed the commode so I stood like this, put my hand back on her, on her arms laying on the arms of the chair, and put my hand like this trying to flush the toilet. Then I released—I couldn't do it and I let go and just flushed the toilet and turned right back around and she stood up just an instant like that (snaps fingers) * * *" and then "just sat down * * * real hard * * * on the floor."

Mrs. Emilie Smith, who testified before Mrs. Lochte took the stand, stated that she met Mrs. Lochte as she was coming off duty the first night (morning of December 19) and she chatted briefly with her at that time. She testified that on the afternoon of the 19th she again went to the hospital to take her mother some toilet articles and at that time her mother was

---

2. A careful reading of the record extract does not reveal the precise location of this chair.

quite cheerful and was sitting up in a hospital room chair. She stated that she had herself taken her mother to the bathroom on that afternoon. In her testimony Mrs. Smith neither affirmed nor denied that she had given instructions to Mrs. Lochte to take her mother to the bathroom at 6:30 a.m. on the morning of December 20, 1961. Her husband John Smith, Jr., however, did testify that at 11:00 p.m. on December 19, 1961, the time which Mrs. Lochte stated that she had had the conversation with Mrs. Smith, the latter was in bed, and that he and his wife had spent the entire evening, after 7:00 p.m., at home.

Mrs. Epple's doctor, Dr. Ashby Wade Smith (no relation to the plaintiff-appellant) testified that he had given no orders in regard to Mrs. Epple's use of the lavatory, that he had not ordered restraints put on the patient while she was in bed and that he had not restricted Mrs. Epple from sitting up in a chair or in any other manner restricted her from being ambulatory.

On this appeal the appellant asserts that Mrs. Lochte's paranoid schizophrenic mental condition led her to take imprudent and irrational actions which were the proximate cause of Mrs. Epple's fall. This contention is devoid of merit because the evidence is insufficient to relate Mrs. Lochte's mental aberrations to the actions taken by her in regard to this patient.

In an attempt to associate Mrs. Lochte's mental condition with the events which transpired on the morning of December 20, 1961, the appellant asserts that Mrs. Lochte's testimony reveals that she had an insane delusion that Mrs. Smith had instructed her to get the elderly patient up at 6:30 in the morning and take her to the bathroom. According to the appellant the following colloquy between Mrs. Lochte and plaintiff's counsel reveals that Mrs. Lochte testified that Mrs. Smith was not "physically there" in the room when she received the instructions, but that Mrs. Lochte had merely heard a "voice" giving her these instructions.

"Q. Now that voice on the phone[3] that you heard when you called Mrs. Smith, was that the same voice or same Mrs. Smith that told you to remove the re-

3. Refers to a telephone conversation between Mrs. Lochte and Mrs. Smith in which the latter was informed of her mother's fall.

straints? A. Yes, sounded like the same one. I worked the switchboard at secretarial school. I can recognize the voice pretty much.

Q. The night before when Mrs. Smith told you to remove the restraints *did you actually see her tell you or did you hear her voice?* A. *I heard. She told me.*

Q. You hear [heard] her tell you? A. She said take her out of bed. That meant she wanted me to remove the restraints and take her out of bed. How could I without taking the restraints off?

Q. Now the night before when she told you this did you actually see her there in front of you tell you, or did you— A. No. She didn't demonstrate to me.

Q. No, that is not my question, Mrs. Lochte. The night before when she told you this, *did you actually * * *see her in front of you, telling you this or did you hear her voice telling you this?* A. I heard her voice.

Q. You heard her voice. A. She was telling me what to do." (Emphasis added.)

The meaning which the appellant purports to find in the above dialogue if not itself hallucinatory, at least is not a meaning which a jury, applying proper rules of language and common sense, could conceivably extract from the words used. Mrs. Lochte's testimony, when read in context, merely reveals that she *heard* Mrs. Smith give the instructions rather than that she saw the instructions being played out in some charade-type fashion. Since Mrs. Lochte testified that Mrs. Smith "didn't demonstrate" to her, it was both grammatically correct and logically consistent for her later to say that she heard rather than that she saw the instructions given. From other portions of Mrs. Lochte's testimony, it is clear that she did testify, in effect, that Mrs. Smith was physically in the room when she gave the instructions. For instance, Mrs. Lochte testified that Mrs. Smith put up the sides of Mrs. Epple's hospital bed, an exercise that was unlikely to have been attempted by a mere "voice."

The appellant further asserts that Mrs. Lochte must have suffered hallucinations and delusions because the portions of

her testimony dealing with the supposed instructions were "impossible" in that it assertedly conflicted with her own (Mrs. Smith's) testimony and that of her husband. In making this contention the appellant blandly assumes that one can place a witness on the stand to prove how an accident occurred and be bound by that testimony but not be bound by other portions of the testimony of the same witness which purportedly were drawn from the witness so that she might demonstrate her unsound mental condition at the time of the accident. We do not think that this type of division is permissible, but even if it were, such permissive division would here avail appellant nothing since the appellant can point to no portion of Mrs. Lochte's testimony which comes close to showing that she had such an unsound mental condition, and the appellant was thus bound by it all. In any event, Mrs. Smith's own testimony does not contradict Mrs. Lochte as to either the time of, or the actual giving of, the instructions which the appellant now says were hallucinatory, and there was certainly nothing inherently aberrational or impossible about a concerned relative, who was familiar with an elderly patient's toilet habits, requesting that a night duty practical nurse take that patient to the commode at a certain hour in the morning. Furthermore, Mr. Smith's testimony did not make Mrs. Lochte's testimony as to the instructions from Mrs. Smith impossible; it merely showed at most that Mrs. Lochte may have been incorrect as to the precise hour at which the instructions were given, a fact totally immaterial here. Viewed in the light most favorable to the plaintiff, there was produced no evidence legally sufficient to connect Mrs. Lochte's mental illness with the happening of the accident upon which this suit was based.

Aside from the matter of her mental condition, the appellant asserts that it was properly a jury question as to whether Mrs. Lochte had been negligent in removing the restraints from Mrs. Epple and taking her to the bathroom rather than electing to use a bedpan. We do not agree. It is clear from the testimony before us that the restraints were placed on the patient not to insure that Mrs. Epple would remain permanently in bed (as portions of appellant's brief appear to assume), but to insure that she would not injure herself while restlessly moving about

in bed. There was an absence of any testimony that Mrs. Epple was so weak or senile that she should not have been allowed to be ambulatory and, in fact, Mrs. Smith testified that she herself had helped her mother walk to the bathroom on the day before the accident. The family doctor (Dr. Ashby Smith) had placed no restrictions on her use of the lavatory and Mrs. Lochte's choice, under these circumstances, to allow her patient to get the exercise of going to the bathroom rather than using the bedpan was not sufficient evidence to take the case to the jury.

Moreover, the particular manner in which Mrs. Lochte testified that she took Mrs. Epple to the commode and the extensive precautions she took to make sure that Mrs. Epple was securely seated in the chair, before turning to flush the toilet, certainly did not reveal any lack of due care or proper supervision on Mrs. Lochte's part. While hindsight reveals that the accident might have been prevented if Mrs. Epple had been taken back to bed before the toilet was flushed, there was nothing negligent in the alternative course of action taken by Mrs. Lochte. In fact there is no evidence in this case that Mrs. Lochte took any action which might not have been taken by the most competent of nurses or that she failed to take any preventive measure which should have been taken by a reasonably prudent nurse under similar circumstances.

In her brief the appellant lists four instances of alleged negligence on the part of the defendant's agents other than the actions of Mrs. Lochte. The appellant asserts that the home's nurses were negligent when, having been put on notice of the patient's unruly condition, they:

> "1. Failed to administer sleeping sedations at 1 A.-M. as prescribed by Dr. Ashby Smith.
>
> "2. Failed to supervise return of patient to bed after she had been taken to toilet about 6 A.M., to assure her safety throughout the early morning.
>
> "3. Attempted *later* to walk patient to bathroom *again* after she had broken hip at about 6:30 A.M.
>
> "4. Failed to call Dr. Ashby Smith until 9:00 A.-M., several hours after the fall. Actually the plaintiff herself called him."

First, while there was testimony by one nurse that she personally did not give Mrs. Epple any medication at 1:00 a.m. on December 20, there is no evidence one way or the other as to whether this was done by another nurse at 1:00 a.m., or at some other hour during the night. Moreover, the appellant does not even hint at what connection this alleged failure to give sleeping sedation might have had with Mrs. Epple's fall, and none is apparent. The second asserted act of negligence, like the first, is not argued in the appellant's brief but we are merely referred to a page in the record extract. That page contains Nan Merritt's testimony as to what she did after she discovered Mrs. Epple had been injured. Even if Nan Merritt's acts did amount to negligence they were, like the two others (Nos. 3 and 4 as set out above), acts which followed Mrs. Epple's fall, and hence are immaterial here since the only negligence alleged in plaintiff's declaration was failure to properly supervise and care for Mrs. Epple prior to her fall.

Since there was no evidence of breach by the defendant corporation of its contractual duty to provide adequate supervision and care of Mrs. Epple, the trial judge was correct in directing a verdict for the defendant at the close of the plaintiff's case.

*Judgment affirmed, with costs.*