Henry BREMENKAMP, Jr., Guardian
and Conservator for Frank J.
Bremenkamp, Plaintiff,

v.

BEVERLY ENTERPRISES–KANSAS,
INC., Defendant.

Civ. A. Nos. 89–2006–O, 89–2060–O.

United States District Court,
D. Kansas.

April 8, 1991.

James T. Wiglesworth, Perry & Hamill, Overland Park, Kan., for plaintiff.

David W. Hauber, Kenneth E. Holm, Boddington & Brown, Chtd., Kansas City, Kan., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter comes before the court on the motion of defendant Beverly Enterprises–Kansas, Inc. (hereinafter "Beverly Enterprises") for partial summary judgment. Defendant contends that Frank J. Bremenkamp (hereinafter "Bremenkamp") has failed to make a *prima facie* showing of negligence on the part of Beverly Enterprises. Defendant also asserts that plaintiff's claim of damages for loss of enjoyment of life is not cognizable under the law

of Kansas. Beverly Enterprises likewise claims that plaintiff is not entitled to submit a request for punitive damages or damages for future nursing or attendant care. For the reasons stated below, the court will deny defendant's motion for partial summary judgment.

## I. STATEMENT OF FACTS

Beverly Enterprises owns numerous facilities in which it provides care for handicapped and elderly residents. Defendant states that it is "committed to promptness in responding to the concerns [of residents and their families] and will report action taken to resolve them as to each resident or family member." Bremenkamp was a resident in two of defendant's facilities. He resided at Golden West Skills Center in Goodland, Kansas, from April of 1983 to January of 1987. He was admitted to Golden West because it was believed that he would benefit from a less restrictive setting than a state hospital. Bremenkamp also lived at Lantern Park nursing home in Colby, Kansas, from June of 1987 to October of 1988.

Bremenkamp contends that he fell and fractured his femurs while he was left improperly restrained and unattended in a bathroom at Lantern Park Manor.[1] Tosha Lee Mindrup discovered Bremenkamp sitting on the floor of the bathroom with one hand on his wheelchair at approximately 11:00 a.m. on July 13, 1987. She was certain that Bremenkamp did not get to the toilet by himself. Mindrup believed a member of Beverly Enterprises' staff must have assisted Bremenkamp because he was not capable of untying his "posey" vest restraint, putting the vest back on his wheelchair, moving onto the toilet, and removing his disposable diaper. Mindrup attributed Bremenkamp's apparent fall to a shortage of staff at Lantern Park Manor.

The parties agree that Bremenkamp had some swelling of his legs and experienced occasional pain in his lower extremities before July 13. Two days after the alleged fall, defendant's nursing staff reported that severe swelling of Bremenkamp's right foot, ankle, and knee made it difficult to detect a pulse in the leg. Nurses' notes also state that the patient's right leg was "warm to touch" and was incapable of being moved in the early evening hours of July 15. Bremenkamp was unable to straighten his leg that night. Since he could not go to defendant's cafeteria, he was served dinner in bed. On the morning of July 16, 1987, there was discoloration over the anterior surface of Bremenkamp's right lower leg.

Two weeks later, Bremenkamp informed an employee of Beverly Enterprises that he could not stand because standing caused pain in his knees. In the early morning hours of the next day, July 31, 1987, Bremenkamp had three blisters on his upper right leg and later that morning one of defendant's nurses observed "a prominent blunt object ... pushing outward from" Bremenkamp's right knee. The object had a pin point hole in the middle of it from which bloody fluid flowed out. On August 3, Bremenkamp was transported to the Kansas University Medical Center where his legs were x-rayed by Dr. Mark D. Murphy, a diagnostic radiologist. The x-rays revealed that Bremenkamp had sustained fractures in both of his legs. An examination also revealed that his right leg was severely infected. Bremenkamp's right leg, from above the knee, was amputated later that day by Dr. Bradford Olney, an orthopedic surgeon.

Bremenkamp's mental and physical condition, as well as his ability to care for himself at the time of his alleged fall, are in dispute. Bremenkamp suffered from numerous physical problems, including arthritis, mild quadriplegia, a degenerative disease that caused his bones to become brittle, and a history of seizure activity. Bremenkamp also appears to be brain damaged, mentally retarded, and poorly coordinated. When he resided at Lantern Park

---

1. The femur or thigh bone is the longest and largest bone in the human skeleton. This bone extends from the pelvis to the knee and is ordinarily perfectly cylindrical in the greater part of its extent. The femur, like other long bones, is divisible into a shaft and two extremities. H. Gray, *Anatomy, Descriptive and Surgical* 183 (1974).

Manor, he was confined to a wheel chair and had difficulty maintaining his balance as a result of the hunchbacked curvature of his spine.[2] In May of 1986, defendant stated in an occupational therapy evaluation that Bremenkamp was "independent" in the following areas of daily living: feeding, dressing, toileting, and communication. The evaluation added that he had "excellent" self-control and "good" orientation, concentration and attention span.

A Golden West "interdisciplinary plan of care" reported that Bremenkamp "will find successful placement at Prairie Development Center of Atwood, Kansas and work in competitive employment." The plan stated in the alternative that Bremenkamp could live in a group home and work in a sheltered environment. On January 23, 1987, defendant's social services ninety-day review reported that Bremenkamp's placement outside the facility was appropriate and his prognosis was "good." On June 18, 1987, Bremenkamp's prognosis was reported as "good for minimal assistance required for activities of daily living" and defendant's functioning status report at that time indicated that his potential for maximum rehabilitation was not certain but it was nevertheless favorable.

Plaintiff contends that Beverly Enterprises was reckless in employing an inadequate number of employees to properly care for patients at Lantern Park Manor. Mindrup, the employee who discovered Bremenkamp on the floor, later resigned because she believed the facility was understaffed and the few staff members on duty were overworked. These same sentiments were expressed by several other employees who voluntarily terminated their employment with defendant for the same reasons as Mindrup, including one whose resignation was accepted on the very day of Bremenkamp's alleged fall. Teresa Hapke, a nurse at Lantern Park Manor, reported to an investigator from the Kansas Department of Social and Rehabilitation Services (hereinafter "SRS") that "there was not enough staffing."

## II. SUMMARY JUDGMENT STANDARDS

In considering a motion for summary judgment, the court must examine all the evidence in a light most favorable to the nonmoving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. S.W. Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). If the moving party does not bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden is met when the moving party identifies those portions of the record which demonstrate the absence of material fact. *Id.* at 323, 106 S.Ct. at 2552–53.

Once the moving party meets these requirements, the burden shifts to the party resisting the motion, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (emphasis added). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleading." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

## III. DAMAGES

### A. *Attendant Care*

■ The purpose of awarding damages is to make a party whole by restoring that party to the position he was in prior to his injury. *Samsel v. Wheeler Transp. Serv., Inc.*, 246 Kan. 336, 345, 789 P.2d 541, 552 (1990); *Stephan v. Wolfenbarger & McCulley, P.A.*, 236 Kan. 183, 189, 690 P.2d 380, 385 (1984). Beverly Enterprises

**2.** Bremenkamp was restrained or held in his wheelchair by a "posey" vest.

argues that plaintiff may not assert a claim for the costs of attendant or nursing care in the future because such care was already required for Bremenkamp's preexisting condition of paraplegia.[3] Defendant claims that Bremenkamp, despite the amputation of his right leg and the fracture of his left leg, would have nonetheless lived the remainder of his life in need of the identical institutionalized care that is required as a result of his spinal condition.[4] We disagree. All paraplegics do not require the same care.

The amount and type of care that a paraplegic person requires depends upon the level of independence he or she is capable of achieving:

> Many spinal cord paralysed persons achieve a high level of independence. Young paraplegics can live totally independent lives with only minimal handicaps and need no specialised nursing. However, high level quadriplegics, elderly paraplegics, and those with other motor skeletal disabilities are unable to achieve maximum independence levels and require considerable nursing and personal care. The aim should be to maintain all these spinal cord paralysed persons at home (when desired) with the provision of appropriate support services. However, this may not be acceptable or

possible for many disabled or their families especially when high levels of personal care are required.

*Lifetime Care of the Paraplegic Patient* 177 (G. Bedbrook ed. 1985).[5] Bremenkamp appears, by defendant's own admissions, to have been capable of achieving a high level of independence before his alleged injury in 1987.[6] In May of 1986, defendant stated in an occupational therapy evaluation that Bremenkamp "works well independently."[7] The evaluation added that he had "excellent" self-control and "good" orientation, concentration and attention span.

Two days after the evaluation, the Golden West "interdisciplinary plan of care" reported that Bremenkamp "will find successful placement at Prairie Development Center of Atwood, Kansas and work in competitive employment." The plan stated in the alternative that Bremenkamp would live in a group home and work in sheltered employment in two years. On January 23, 1987, defendant's social services ninety-day review reported that Bremenkamp's placement outside the facility was appropriate and his prognosis was "good." On June 18, 1987, Bremenkamp's prognosis was reported as "good for minimal assistance required for activities of daily living" and defendant's functioning status report at

---

3. Paraplegia is defined as the paralysis of the legs and lower part of the body, both motion and sensation being affected. This condition is caused by injury or disease of the spine, locomotor ataxia, transverse myelitis, chronic alcoholism, malaria, anemia, and lesion of the brain. *Dorland's Illustrated Medical Dictionary* 1099 (24th ed. 1965). Dr. Redford, Bremenkamp's treating physician, testified that it was not clear whether his patient's paraplegia was caused by an acute trauma to the spinal cord or a continuing degenerative process.

4. The degree of loss in sensation, motion, and reflexes experienced by paraplegic patients depends upon the severity of damage to their spinal cords. *Mosby's Medical, Nursing, and Allied Health Dictionary* 878 (3d ed. 1990). While defendant notes increased curvature and several fractures of Bremenkamp's spine, there is conflicting evidence as to the range of sensation and motion in Bremenkamp's lower extremities before and after the alleged injuries to his legs.

5. There are many types of institutional living arrangements with varying degrees of cost and care. *See, e.g.,* J. Nassau, *Choosing a Nursing*

*Home* 11–25 (1985) (range of available health care facilities is extensive: skilled nursing facilities, day hospitals, intermediate care facilities, home health programs, nursing homes, and outpatient services); C. Jones, *Caring for the Aged* 5–30 (1982) (nursing care services are provided by a wide range of institutions and programs: adult day care centers, elderly housing, retirement villages, nursing homes, and hospices).

6. The reason Bremenkamp was in fact transferred from a state hospital to defendant's facility was to provide him with a less restrictive setting and a "higher independent status." Golden West's admissions committee "agreed that [Bremenkamp] could benefit from less structure" than the living arrangement provided by Norton State Hospital.

7. More specifically, the evaluation noted that Bremenkamp was "independent" in the following areas of daily living: feeding, dressing, toileting, and communication.

that time indicated his potential for maximum rehabilitation was not certain but it was nevertheless favorable.

■ The law is well settled that ordinarily the assessment of damages in personal injury cases is exclusively the province of the jury. *See, e.g., Germann v. Blatchford,* 246 Kan. 532, 537, 792 P.2d 1059, 1064 (1990); *Kansas Malpractice Victims Coalition v. Bell,* 243 Kan. 333, 342–43, 757 P.2d 251, 258 (1988); *Brown v. Godfrey,* 200 Kan. 568, 572, 438 P.2d 117, 121 (1968); *Johnson v. Meade,* 1 Kan.App.2d 254, 257–58, 563 P.2d 522, 525 (1977). We believe that a jury, after the presentation of live testimony, could determine with greater accuracy than the court, at this stage of the litigation, whether the injuries to Bremenkamp's legs affected his level of independence, and thus his need for a higher degree of care. The court will therefore deny defendant's summary judgment motion as to plaintiff's claim of damages for future nursing or attendant care.

### B. *Loss of Enjoyment of Life*

■ Defendant Beverly Enterprises contends that plaintiff's claim of damages for loss of enjoyment of life is not cognizable under the law of Kansas. Damages for loss of enjoyment of life compensate a person for the limitations forced upon his or her life by an injury. *Rufino v. United States,* 829 F.2d 354, 361 (2d Cir.1987); *Thompson v. Nat'l R.R. Passenger Corp.,* 621 F.2d 814, 824 (6th Cir.), *cert. denied,* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980). The highest appellate courts of many states are divided as to whether "loss

of enjoyment of life" is an element of, or merely a factor in awarding, damages to compensate a plaintiff for a personal injury. *See* Annotation, *Loss of Enjoyment of Life as a Factor in Awarding Damages,* 34 A.L.R.4th 293 (1984).[8] Some courts have held that a jury may not be instructed to allow separate damages for loss of enjoyment of life, on grounds that such damages are too difficult to measure or that they overlap with other allowable elements of damage. *See, e.g., Nemmers v. United States,* 681 F.Supp. 567, 574 (C.D.Ill.1988) (damages for loss of enjoyment of life are usually too speculative or uncertain), *aff'd,* 870 F.2d 426 (7th Cir.1989); *Judd v. Rowley's Cherry Hill Orchards, Inc.,* 611 P.2d 1216, 1221 (Utah 1980) (loss of enjoyment of life overlaps with damages for pain and suffering); *cf. Burke v. United States,* 605 F.Supp. 981, 991–92 (D.Md.1985) (plaintiff entitled to consideration of effect of injuries on enjoyment of life).

While "loss of enjoyment of the pleasurable things of life" is not a separate and distinct category of damages in Kansas, such damages are "inextricably included within the more traditional areas of damages for disability and pain and suffering." *Gregory v. Carey,* 246 Kan. 504, 510, 791 P.2d 1329, 1336 (1990); *Leiker v. Gafford,* 245 Kan. 325, 340, 778 P.2d 823, 835 (1989). Plaintiff's claim for damages for loss of enjoyment of life is clearly compensable as an element of disability and pain and suffering. Defendant's summary judgment motion as to plaintiff's alleged loss of enjoyment of life will be denied.[9]

---

**8.** A great deal has been written in recent years on the issue of whether damages are recoverable for loss of enjoyment of life as a separate category of damages or as a component of the more traditional categories of pain and suffering and/or disability. *See, e.g.,* Note, *Damages—Loss of Enjoyment of Life—New York Court of Appeals Denies Loss-of-Enjoyment Damages to Comatose Plaintiffs,* 103 Harv.L. Rev. 811 (1990); Staller, *Placing a Value on the Enjoyment of Life,* 31 For the Defense, June 1989, at 8; Hilton and Goldstein, *Damages for Loss of Enjoyment of Life in Personal Injury Cases,* 30 For the Defense, Nov. 1988, at 2; Hermes, *Loss of Enjoyment of Life—Duplication of Damages Versus Full Compensation,* 63 N.D.L.

Rev. 561 (1987); Comment, *Loss of Enjoyment of Life as a Separate Element of Damages,* 12 Pac.L.J. 965 (1981).

**9.** Beverly Enterprises argues in its reply brief that plaintiff may not introduce the expert testimony of an economist to assist the jury in determining damages for loss of enjoyment of life. We believe this is a matter more properly brought before the court in a motion in limine. The court will issue a ruling after Beverly Enterprises has filed its motion in limine and plaintiff has had an opportunity to respond to defendant's argument.

## IV. PRIMA FACIE SHOWING OF NEGLIGENCE

■ Defendant argues that plaintiff has failed to make a prima facie showing of any facts from which the court might discern that Beverly Enterprises proximately caused plaintiff's injuries as a matter of law. The occasions are extremely rare where a court is justified in taking the case from a jury and deciding the questions of negligence and proximate cause as a matter of law. *Tersiner v. Union Pac. R.R. Co.*, 740 F.Supp. 1519, 1524 (D.Kan.1990); *Schenck v. Thompson*, 201 Kan. 608, 617, 443 P.2d 298, 307 (1968).[10] These issues, however, may be decided by the court when all of the evidence upon which a party relies is undisputed and susceptible of only one inference. *Union Pac. R.R. Co. v. Gen. Foods Corp.*, 654 F.Supp. 1074, 1078 (D.Kan.1987).

### A. Duty of Care

■ In a negligence case, the plaintiff must establish a duty of reasonable care owed by the defendant to the plaintiff, a breach of that duty, damage to the plaintiff, and a causal connection between the duty breached and the damage sustained. *Connolly v. Samuelson*, 671 F.Supp. 1312, 1316 (D.Kan.1987); *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86, 91 (1983). The administrator of an adult care center or nursing home is under a duty to exercise reasonable care to avoid injuries to patients. *Juhnke v. Evangelical Lutheran Good Samaritan Society*, 6 Kan.App.2d 744, 748, 634 P.2d 1132, 1136 (1981) (citing 40 Am.Jur.2d *Hospitals and Asylums* § 36 (1968)). The reasonableness of such care is to be assessed in light of the patient's physical and mental condition. *Id.* In other words, the court must take into account the patient's ability or inability to care for himself. Annotation, *Patient Tort Liability of Nursing Homes*, 83 A.L.R.3d 871, 875 (1978) (citing *MacAlpine v. Martin*, 205 So.2d 347, 349 (Fla.App.1967)).[11]

■ Defendant describes Bremenkamp as brain damaged, mentally retarded, and poorly coordinated. Beverly Enterprises adds that he suffered from numerous physical problems, including arthritis, mild quadriplegia, a degenerative disease that caused his bones to become brittle, and a history of seizure activity. Defendant also points out that Bremenkamp had suffered injuries as a result of falls on numerous occasions before July of 1987. At the time of Bremenkamp's alleged fall, he was confined to a wheel chair and had difficulty obtaining his balance as a result of the hunchbacked curvature of his spine. Victoria Weaver, R.N., a nursing expert, testified that a member of defendant's nursing staff should have remained in the bath-

---

**10.** Negligence actions are seldom an enclave for trial judge finality. Such cases can rarely be disposed of by summary judgment, even where historical facts are concededly undisputed, because of "the peculiarly elusive nature of the term 'negligence' and the necessity that the trier of facts pass upon the reasonableness of the conduct in all the circumstances in determining whether it constitutes negligence." *Gauck v. Meleski*, 346 F.2d 433, 437 (5th Cir.1965). *See also Hughes v. Am. Jawa, Ltd.*, 529 F.2d 21, 23 (8th Cir.1976) (tort actions usually not appropriate for disposition by summary judgment because such actions generally encompass multitude of factual issues and abstract concepts that become elusive when applied to varying concrete factual circumstances); *Barron v. Honeywell, Inc.*, 69 F.R.D. 390, 392 (E.D.Pa.1975) (summary judgment is rarely appropriate for negligence cases because application of reasonable person standard normally requires full exposition of all underlying facts and circumstances).

**11.** The duties of a nursing home to its patients are sometimes treated as contractual in origin. *See, e.g., Smith v. Silver Spring–Wheaton Nursing Home, Inc.*, 243 Md. 186, 195, 220 A.2d 574, 579 (1966); *Dunahoo v. Brooks*, 272 Ala. 87, 89, 128 So.2d 485, 486 (1961). Defendant's president, Robert Stephens, states in an employee handbook, that Beverly Enterprises has a special responsibility "to provide the highest quality of care possible, 24 hours a day, 365 days a year." *Beverly Enterprises Non–Managerial Handbook* 1 (April, 1987). Defendant's literature also states the services of a physician are available to provide medical care in the case of emergencies on a twenty-four-hour, seven-day basis. *Emergency Physician Services Policy*, Exhibit LL to Plaintiff's Second Request for Admissions. While such statements may form the basis for a contractual standard of care, we believe based on the *Juhnke* case that the Kansas Supreme Court would apply the general law of negligence to define the duties of a nursing home to its patients.

room while Bremenkamp was using the toilet to provide support in the event that he might fall. After giving plaintiff the benefit of all favorable inferences, the court has no difficulty concluding under these circumstances that defendant's duty, as a matter of law, included at minimum the escorting of Bremenkamp to the bathroom.

## B. *Proximate Cause*

■ Beverly Enterprises argues that plaintiff has failed to make a prima facie showing that defendant's negligence was the proximate cause of Bremenkamp's alleged injuries and damages. In order for a plaintiff to recover in a negligence action, the defendant's breach of duty must be the actual and proximate cause of injury. *Baker v. City of Garden City*, 240 Kan. 554, 557, 731 P.2d 278, 280 (1987); *George v. Breising*, 206 Kan. 221, 225, 477 P.2d 983, 986 (1970). The proximate cause of an injury is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. *Wilcheck v. Doonan Truck & Equip., Inc.*, 220 Kan. 230, 235, 552 P.2d 938, 942–43 (1976); *Elliott v. Chicago, R.I. & Pac. R.R. Co.*, 203 Kan. 273, 284, 454 P.2d 124, 133–34 (1969).

Defendant contends that any fracture sustained by Bremenkamp must have occurred when he suffered from a grand mal seizure on July 26, 1987. Dr. Redford, a specialist in physical medicine and rehabilitation, who has a considerable number of years of practice, testified, however, that he was not aware of one instance in which a patient sustained a compound fracture as a result of a seizure. Dr. Redford also stated that "to have a fracture severe enough to comminute a bone, break it up in little pieces from a seizure in the extremities seems a little unlikely." The doctor added that he "never heard of such a thing." Indeed, defendant's medical records report that there was "no evidence of self injury" after Bremenkamp's alleged seizure.[12]

The more compelling evidence suggests that Bremenkamp fell and fractured his femurs while he was left improperly restrained and unattended in the bathroom. As noted above, Tosha Lee Mindrup discovered Bremenkamp sitting on the bathroom floor with one hand on his wheelchair on July 13. She was certain that Bremenkamp did not get to the toilet by himself. Mindrup believed a member of Beverly Enterprises' staff must have assisted Bremenkamp because he was not capable of untying the "posey" vest restraint, putting the vest back on the wheelchair, moving onto the toilet, and removing his disposable diaper.[13] The absence of a diaper in Bremenkamp's room and the fact that his vest was folded and placed over the back of his wheelchair also suggest that Bremenkamp was initially assisted from his wheelchair to the toilet. At one point in her testimony, Mindrup attributed Bremenkamp's apparent fall to a shortage of staff at Lantern Park Manor.

Defendant claims that there was "no sign of injury and [Bremenkamp's] leg symptoms before and after the 13th [of July, 1987] were identical." While defendant's resident did have some swelling of his legs and experienced occasional pain before the day of his alleged fall, there is no question that the condition of Bremenkamp's legs was much worse after July 13, 1987. Two days after the alleged fall, members of defendant's nursing staff re-

12. Defendant claims that Bremenkamp's fracture was sustained approximately one week before his x-ray examination on August 4, 1987, but Dr. Murphy, the physician who took the x-rays of Bremenkamp's legs, opined that callus on the bones as depicted in x-rays indicate that the fracture was sustained at least two to three weeks before it was detected on August 3.

13. Defendant's medical expert, Dr. David Johnson, concedes that a "posey" vest restraint can be tied under the wheelchair so it cannot be reached by a patient. Even if the court was to accept defendant's explanation for Bremenkamp's presence on the floor—that he "just slid out of the chair"—Beverly Enterprises would nonetheless appear to have been negligent for failing to properly restrain its resident.

ported that the severe swelling of Bremenkamp's right foot, ankle, and knee made it difficult to detect a pulse in the leg. Nurses' notes also state that the patient's right leg was "warm to touch" and was incapable of being moved in the early evening hours of July 15. Bremenkamp was unable to straighten his leg that night. Since he could not transport himself to defendant's cafeteria, he was served dinner in bed.

On the morning of July 16, 1987, there was discoloration over the anterior surface of Bremenkamp's right lower leg. Two weeks later, Bremenkamp informed an employee of Beverly Enterprises that he could not stand because standing caused pain in his knees. In the early morning hours of the next day, July 31, 1987, Bremenkamp had three blisters on his upper right leg and later that morning one of defendant's nurses observed "a prominent blunt object ... pushing outward from" Bremenkamp's right knee. The object had a pin point hole in the middle of it from which bloody fluid drained out.[14] Dr. Fitzgerald examined Bremenkamp later that day, but at no time did any of defendant's employees inform the doctor that Bremenkamp had been found unattended on the bathroom floor.[15] In fact, a physician was never informed before Bremenkamp's departure on August 3, 1987, to the K.U. Medical Center that he may have suffered injuries as a result of a fall while left unattended on July 13, 1987.

While no two cases are identical, the case at bar is closely analogous to *Powell v. Parkview Estate Nursing Home, Inc.*, 240 So.2d 53 (La.App.1970). In *Powell*, a patient fell while unattended at 10:30 p.m. *Id.* at 55. The nurses on duty that night noted the patient's foot and ankle were swollen but a doctor was not called until the next day. *Id.* at 55. The court of appeals concluded that the patient should have been observed closely after the fall, and discovery of the swollen foot and ankle should have alerted defendant's employees to the patient's need for immediate medical attention. *Id.* at 56. The instant action also resembles *Dusine v. Golden Shores Convalescent Center, Inc.*, 249 So.2d 40 (Fla.Dist.Ct.App.1971). The nursing home patient in *Dusine* was placed into a wheel chair, secured by a "Posey" vest restraint, and left unattended. Approximately twenty minutes later, defendant's employee returned to find the patient lying on the floor. *Id.* at 41. The district court of appeals held that the trial court erred in

14. Beverly Enterprises argues that a nurse cannot be expected to recognize the signs of a fractured bone. This argument is without merit. Most nursing manuals and many nursing textbooks provide the signs, symptoms and treatment of a bone fracture. *See, e.g.,* J. Lippincott Co., *Lippincott Manual of Nursing Practice* 768 (5th ed. 1991) (pain at site of injury, swelling, tenderness, deformity and loss of motion are signs of fracture); P. Beare & J. Myers, *Principles and Practice of Adult Health Nursing* 167 (1990) (symptoms of fractured bone are swelling, pain, tenderness, loss of functional ability, deformity, discoloration and crepitus); P. Potter & A. Perry, *Fundamentals on Nursing: Concept, Process and Practice* 1194 (2d ed. 1989) (treatment of fracture includes proper alignment of bone and immobilizing bone to promote healing); J. Thompson, G. McFarland, J. Hirsch, S. Tucker & A. Bowers, *Mosby's Manual of Clinical Nursing* 423–26 (2d ed. 1989) (physical examination of fractured bone will show color change, local deformity, limitation of movement and crepitation; subjective signs include pain, tingling, numbness and weakness); D. Saxton, P. Pelikan, P. Nugent & P. Hyland, *Addison–Wesley Manual of Nursing Practice* 682 (1983) (symptomatology of fracture: discomfort or pain at site of injury, contusion, abnormal mobility, changes in skin and temperature, crepitation, alterations in sensation and alignment and impairment of normal function). As noted above, Bremenkamp experienced many of these signs of a bone fracture after his alleged fall. We most certainly hope, especially under the circumstances present in the instant action, that the nursing personnel of a provider of "nursing care," as defined by K.S.A. 39–923, would at least be alerted by the symptoms of a fractured bone.

15. Defendant had a standing policy on July 13, 1987, the day of Bremenkamp's alleged fall, of instructing its employees that they were to assume the worst and inform a patient's attending physician and family at anytime a resident was found on the floor or a fall occurred on the premises. Bremenkamp's attending physician, Dr. Regier, testified that she would have ordered an x-ray of her patient's legs had she been informed that Bremenkamp had fallen or been found on the bathroom floor. Indeed, on a previous occasion in 1985 at Golden West Skills Center, Bremenkamp was found on the floor, his personal physician, Dr. Long, was apprised of the incident, and he ordered x-rays to be taken of his patient's legs.

directing a verdict for *Golden Shores* and held that a "jury could very well have determined from the facts and inferences therefrom that the appellee was negligent in caring for the appellant." *Id.* at 42. *See also Marotte v. Whitehall of St. Petersburg, Inc.*, 195 So.2d 225, 227 (Fla.Dist. Ct.App.1967) (summary judgment for defendant held erroneous where patient was left unattended in chair and discovered two hours later on floor).[16]

We believe that the evidence relied on by the parties, with regard to causation, is susceptible to more than one inference and, therefore, must be must be passed upon by the trier of facts. The court is convinced that sensible men and women could reach different conclusions as to the reasonableness of defendant's conduct. Moreover, the facts, when construed in favor of the nonmoving party, strongly suggest that plaintiff's fall and alleged injuries are the "natural and probable consequence" of defendant's failure to have an employee in attendance at the time in question. We are convinced at this stage of the litigation that plaintiff has a viable cause of action based on negligence. Accordingly, Bremenkamp may proceed to trial against Beverly Enterprises on these grounds. The court will deny defendant's motion for summary judgment.

## V. PUNITIVE DAMAGES

■ Defendant Beverly Enterprises contends that plaintiff is not entitled to submit a claim for punitive damages. The law of Kansas does not require a specific finding of intentional and ruthless desire to injure in order to sustain an award of punitive damages. *Ford v. Guarantee Abstract & Title Co., Inc.*, 220 Kan. 244, 262, 553 P.2d 254, 269 (1976).[17] Punitive damages are imposed under Kansas law for "a willful and wanton invasion of the injured party's rights, the purpose being to restrain and deter others from the commission of like wrongs." *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1446 (10th Cir.1987) (applying Kansas law); *Bearden v. John Hancock Mut. Life Ins. Co.*, 708 F.Supp. 1196, 1197 (D.Kan.1987); *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 481, 738 P.2d 1210, 1239 (1987).[18]

■ Wantonness refers to the mental attitude of a wrongdoer rather than a particular act of negligence. *Gould v. Taco Bell*, 239 Kan. 564, 572, 722 P.2d 511, 518 (1986). A plaintiff, however, is not required to show intentional wrongdoing to establish that a defendant's conduct was "wanton". *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 73–74, 755 P.2d 1319, 1333 (1988). In order for a negligent act to constitute wantonness, so as to sustain recovery of punitive damages, the actor must be deemed to have realized the imminence of injury to others from acts or omissions and to have refrained from taking steps to prevent injury because of indifference as to whether such injury occurred. *Atkinson v. Orkin Exterminating Co., Inc.*, 5 Kan.App.2d 739, 746, 625 P.2d 505,

**16.** Circumstantial evidence linking a nursing home's negligence to an unattended patient's fall has been held sufficient to support a verdict for plaintiffs on numerous occasions. *See, e.g., Gunn v. Hi–C–Home, Inc.*, 260 Or. 404, 408, 490 P.2d 999, 1001 (1971) (nursing home should have reasonably foreseen activation of fountain would cause unattended patient's fall); *Laidlaw v. Andrew Freedman Home*, 32 A.D.2d 754, 754, 300 N.Y.S.2d 979, 980 (1969) (judgment dismissing complaint reversed where negligence of defendant's employee caused unattended resident to fall in bathroom); *Facey v. Merkle*, 146 Conn. 129, 135–36, 148 A.2d 261, 265 (1959) (defendant's negligence caused elderly patron's fatal fall down stairway in nursing home).

**17.** Punitive damages, however, are not the right of every plaintiff, but are awarded in certain cases to punish the defendant, and not to compensate the plaintiff. *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 70, 755 P.2d 1319, 1331 (1988); *McDermott v. Kansas Pub. Serv. Co.*, 238 Kan. 462, 464, 712 P.2d 1199, 1201 (1986); *Bowman v. Doherty*, 235 Kan. 870, 882, 686 P.2d 112, 122 (1984).

**18.** Punitive damages may also be awarded whenever elements of gross negligence, fraud, malice and oppression mingle in controversy. *Wisker v. Hart*, 244 Kan. 36, 41, 766 P.2d 168, 173 (1988); *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, 316, 607 P.2d 1339, 1347 (1980); *Nordstrom v. Miller*, 227 Kan. 59, 70, 605 P.2d 545, 555 (1980) (quoting *Sanders v. Park Towne, Ltd.*, 2 Kan.App.2d 313, 318–19, 578 P.2d 1131, 1136, *rev. denied*, 225 Kan. 845 (1978)).

514, *aff'd and remanded*, 230 Kan. 277, 634 P.2d 1071 (1981).[19]

■ Corporations may be held liable for punitive damages arising from the conduct of their employees if "(a) the corporation or its managerial agent authorized the doing and manner of the act; (b) the employee was unfit and the managerial agent of the corporation was reckless in employing and retaining him; (c) the employee was employed in a managerial capacity and was acting in the scope of employment; or (d) the corporation or managerial agent ratified or approved the act of the employee." *Fogarty v. Campbell 66 Express, Inc.*, 640 F.Supp. 953, 965–66 (D.Kan.1986) (quoting *Kline v. Multi–Media Cablevision, Inc.*, 233 Kan. 988, 994, 666 P.2d 711, 714 (1983)); *Miller v. Cudahy Co.*, 592 F.Supp. 976, 1006 (D.Kan.1984) (quoting *Kline v. Multi–Media Cablevision, Inc.*, 233 Kan. 988, 994, 666 P.2d 711, 714 (1983)); *see also Restatement (Second) of Torts* § 909 (1977); *Restatement (Second) of Agency* § 217C (1957).[20]

■ Plaintiff contends Bremenkamp is entitled to punitive damages because Beverly Enterprises was reckless in employing an inadequate number of employees to properly care for patients at Lantern Park Manor. Bremenkamp asserts that defendant made business decisions that were predicated upon its economic interests and profit desires rather than the best interests and medical needs of its patients.[21] Mindrup, the employee who discovered Bremenkamp on the floor, resigned two months later because she believed the facility was understaffed and the few staff members on duty were overworked. These same sentiments were expressed by several other employees who voluntarily terminated their employment with defendant, including one whose resignation was accepted on the very day of Bremenkamp's alleged fall. Another employee stated her reason for leaving as follows:

> Quality of care for residents has deteriorated severely and I can't watch the lack of care given to residents.

Teresa Hapke, a nurse at Lantern Park Manor, reported to an investigator from the Kansas Department of Social and Rehabilitation Services that "there was not enough staffing." Hapke added that "the staff was very short for 60 residents, and hav[ing] two or three people taking care of them is not enough."[22]

Given these facts, the court has no trouble holding that plaintiff is entitled to seek

**19.** Acts of omission as well as acts of commission can be wanton since reckless disregard and indifference are characterized by failing to act when action is called for to prevent injury. *Gould v. Taco Bell*, 239 Kan. at 573, 722 P.2d at 519.

**20.** In assessing punitive damages, the nature, extent, and enormity of the wrong, the intent of the party committing it, and generally all the circumstances attending the particular transaction involved, including any mitigating circumstances which may operate to reduce without wholly defeating such damages, may be considered. *Iola State Bank v. Bolan*, 235 Kan. 175, 192, 679 P.2d 720, 734 (1984); *Ultimate Chem. Co. v. Surface Transp. Int'l, Inc.*, 232 Kan. 727, 731, 658 P.2d 1008, 1010 (1983); *Capitol Fed. Sav. & Loan Ass'n v. Hohman*, 9 Kan.App.2d 217, 219–20, 675 P.2d 384, 388 (1983), *aff'd*, 235 Kan. 815, 682 P.2d 1309 (1984).

**21.** Plaintiff points out that the conduct of Beverly Enterprises is directly contrary to the care it promises their patrons and the consuming public. Defendant's president acknowledged that the company has "ethical and moral obligations to the tens of thousands of men and women who we serve each day." Beverly Enterprises professed to the public that "trained, devoted, people are the key to smooth operations and a supportive emotional environment in a nursing center" upon whose "shoulders rest the responsibility for making a long-term care facility into a home." Defendant defines "proper care" as encompassing "many disciplines but basically revolves around providing sufficient time to meet the physical and social needs of each individual." Beverly Enterprises also says that it is "committed to promptness in responding to the concerns [of patients and their families] and will report action taken to resolve them as to each resident or family member."

**22.** Plaintiff states that other residents throughout Beverly Enterprise facilities were left unattended, fell, and sustained injuries as a result of defendant's understaffing and decline in patient care. In one instance, Bremenkamp reports that another resident's leg was amputated after defendant failed to obtain treatment and the leg became infected.

punitive damages.[23] The facts, framed in a light most favorable to plaintiff, do not merely suggest that a nursing home caused a patient, such as in *Powell*, to wait overnight for medical care. In the case at bar, Bremenkamp waited over three weeks for treatment. During that time, defendant failed to inform a doctor of its patient's possible fall, despite its standing policy to do so, and the many signs of a bone fracture at the site of Bremenkamp's injury—swelling, pain, tenderness, change in temperature, limitation of movement, and discoloration. Further, plaintiff has presented evidence that such negligence may have in fact been caused by inadequate staffing of defendant's facility.[24] The court will deny the motion of Beverly Enterprises for summary judgment as to Bremenkamp's claim for punitive damages.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment is hereby denied.

---

23. The jury shall determine pursuant to K.S.A. (1989 Supp.) 60–3701(a) whether punitive damages shall be awarded to plaintiff. If the jury decides that such damages shall be awarded, the court will conduct a separate hearing to determine the amount of punitive damages. K.S.A. (1989 Supp.) 60–3701(a).

24. Plaintiff has presented sufficient evidence to establish at this stage of the litigation that the level of staffing at defendant's facilities was authorized and expressly ratified by Beverly Enterprises. Nurse Hapke testified that despite defendant's promise *not* to cut the size of the on-duty staff at Lantern Park Manor, the size of the staff was in fact decreased by Beverly Enterprises. Defendant's facility administrator, Larry Booth, was informed by the staff that Lantern Park needed more personnel.