# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 3, 2012 Session

# RHEAETTA F. WILSON ET AL. v. AMERICARE SYSTEMS, INC. ET AL.

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Bedford County**
**No. 10204      F. Lee Russell, Judge**

---

**No. M2011-00240-SC-R11-CV - Filed February 25, 2013**

---

The issue presented is whether the jury verdict against the management company of an assisted living facility for negligence based on understaffing is supported by material evidence. Mable Farrar's physician prescribed Ms. Farrar a daily dose of an over-the-counter medicine for constipation. The nursing staff at the assisted living facility where Ms. Farrar lived did not give the medicine to her as often as prescribed. As a result, Ms. Farrar became constipated and returned to see her doctor. Ms. Farrar's doctor notified the nursing staff at the assisted living facility to give Ms. Farrar three to four enemas each day beginning on May 27, 2004. A facility nurse gave Ms. Farrar one enema on the evening of May 27, none on May 28, and one enema on the evening of May 29. Very soon after receiving the last enema on May 29, Ms. Farrar died from a perforated colon. Her daughters filed a wrongful death action against the nurse who gave the enema, the director of nursing at the assisted living facility, the owner of the facility, and its management company. The suit alleged that the negligence of the staff, the owner, and its management company caused Ms. Farrar's death. The jury returned a verdict finding the nurse thirty percent at fault, the director of nursing twenty percent at fault, and the management company fifty percent at fault based on its failure to provide sufficient personnel at the facility. The management company appealed. The Court of Appeals reversed the jury verdict against the management company, finding that there was no material evidence that staffing deficiencies proximately caused Ms. Farrar's death. We hold that the jury's verdict was supported by material evidence. Accordingly, we reverse the decision of the Court of Appeals and remand the case to the Court of Appeals for review of the award of punitive damages.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded to the Court of Appeals**

SHARON G. LEE, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

Clarence James Gideon, Jr., and Alan S. Bean, Nashville, Tennessee, and Raymond W. Fraley, Jr., Fayetteville, Tennessee, for the appellants, Rheaetta F. Wilson and Lauralyn F. Watson.

Roger W. Dickson, Chattanooga, Tennessee, and David L. Johnson, Nashville, Tennessee, (on appeal); Thomas Pinckney and Susan D. Bass, Nashville, Tennessee, (at trial) for the appellee, Americare Systems, Inc.

**OPINION**

**I.**

Mable Frances Farrar lived at Celebration Way, an assisted living facility in Shelbyville, Tennessee. Ms. Farrar was a retired school teacher who, at the age of eighty-three, was active, happy, social, a regular church-goer, and involved with her friends and family. Except for occasional problems with constipation, Ms. Farrar was in good health. During the summer of 2003, she was hospitalized for four days for constipation and afterwards spent approximately two months in a nursing home regaining her strength. When Ms. Farrar was admitted to Celebration Way in October 2003, her physician, Dr. Alma Tamula, prescribed Ms. Farrar one capful of MiraLAX, an over-the-counter powder laxative, to be taken every morning for constipation. Dr. Tamula testified that she made it "crystal clear" to the staff at Celebration Way that they must immediately notify her if Ms. Farrar became constipated again.

Despite these orders that Ms. Farrar receive MiraLAX daily, the staff at Celebration Way sporadically administered the medication. According to Celebration Way's nursing records, Ms. Farrar received only ninety-one doses of MiraLAX from October 2003 through May 27, 2004. She received no MiraLAX in March, only five doses in April, and eleven doses in May 2004. The actual number of doses she received is unclear because only one bottle of MiraLAX, containing fifteen doses, was ordered and delivered to the facility for Ms. Farrar from October 2003 through May 2004.

The treatment provided to Ms. Farrar in the days leading up to her death is significant. On Thursday, May 27, 2004, Ms. Farrar's daughter, Rheaetta Wilson, took her to see Dr. Tamula because Ms. Farrar was constipated. Despite Dr. Tamula's previous order to the nursing staff at Celebration Way to notify her if Ms. Farrar became constipated, they had not done so. Ms. Farrar told Dr. Tamula that it had been ten to twelve days since her last good bowel movement. Dr. Tamula diagnosed Ms. Farrar with fecal impaction and constipation and ordered the administration of milk and molasses enemas three to four times a day. When advised of Dr. Tamula's diagnosis and treatment order, a staff member at

Celebration Way informed the doctor's office that no one would be available to administer an enema until 10:00 that evening. Mary Ann Steelman, a nurse and the administrator of Celebration Way, only gave Ms. Farrar one enema on the evening of May 27. Even though the applicable standard of care required her to chart Ms. Farrar's symptoms and responses, the type and volume of enema given, and the results, Ms. Steelman did not document anything.

On Friday, May 28, 2004, despite Dr. Tamula's orders, Ms. Farrar was not given an enema. Ms. Farrar told Paula Gann,[1] a caregiver at Celebration Way, that she was not feeling well, she had not had a bowel movement, and "wished she could." Ms. Gann noticed that Ms. Farrar's stomach was distended, and Ms. Gann overheard Ms. Steelman remark to Ms. Farrar that "she looked like she was about to have twins."

On Saturday, May 29, 2004, Ms. Farrar's daughters, Lauralyn Watson and Ms. Wilson, were with her at Celebration Way. In the afternoon, Ms. Watson called Ms. Steelman, who was not at the facility, to tell her that "either Mother needs to go to the hospital or she needs an enema. She's uncomfortable." Ms. Watson testified that Ms. Steelman instructed her not to go to the hospital and that either she or Dottie Hunt, who was another nurse at the facility, would come in and administer the enema. Ms. Gann observed that when Ms. Steelman arrived at Celebration Way following Ms. Watson's phone call, Ms. Steelman appeared to be irritated and "stated that she was going to give Ms. Farrar the enema so she would shit and shut up." Kathy West, another Celebration Way employee, similarly testified that she heard Ms. Steelman say "I'm going to give her this enema so she'll shit and they'll [Ms. Farrar's daughters] shut up." Ms. Steelman admitted that she was "flustrated" at the time and did not deny making the statement. Ms. Farrar's medical records at the facility on that date indicate that Ms. Farrar's abdomen was very distended and that her bowel sounds were overactive in all four quadrants. Ms. Farrar's distention and bowel sounds were classic signs of an intestinal obstruction for which an enema is not appropriate, according to Dr. Deborah Robin, a Vanderbilt School of Medicine faculty member and certified medical director for nursing homes.

Ms. Steelman administered the enema without first percussing Ms. Farrar's abdomen to determine whether she had an obstruction or was constipated. Ms. Steelman admitted that giving an enema to a patient with an obstruction is inconsistent with the applicable standard of care. After receiving the enema, Ms. Farrar's condition began to rapidly deteriorate. Her skin turned pale, grayish, and became moist and clammy. Her blood pressure reading was

---

[1] Ms. Gann worked at Celebration Way from January 2004 until June or July 2004. As a caregiver, her job was to serve dinner, pass out medications, help with patient baths, and put patients to bed. She testified she received no training or orientation and had no supervisor.

94/61 and she showed signs of distress. Ms. Steelman told Ms. Farrar's daughters that Ms. Farrar needed to get to the hospital quickly and 911 was called. When the ambulance arrived, Ms. Farrar's blood pressure reading was 102/70, and her oxygen saturation was seventy-four percent, which in Dr. Robin's opinion was "scary low." Upon arriving at the Bedford County Medical Center emergency room, Ms. Farrar's blood pressure reading had dropped to 85/48, she was not responsive to verbal stimuli, and her lower extremities appeared mottled.[2] Despite emergency treatment efforts, Ms. Farrar died at the hospital on May 29, 2004 at 9:35 p.m. A hospital x-ray of Ms. Farrar's abdomen revealed that her colon was perforated. Dr. Robin testified that the enema was the cause of the perforation.

Ms. Wilson and Ms. Watson ("Plaintiffs") filed this wrongful death action against Ms. Steelman (the nurse who administered the enemas on May 27 and 29, 2004), Ms. Hunt (the director of nursing), Shelbyville Residential, LLC (the owner and operator of Celebration Way), and Americare Systems, Inc. ("Americare"), the company that had contracted with Shelbyville Residential, LLC to provide management services for Celebration Way. The complaint alleged numerous deviations from applicable standards of care resulting in Ms. Farrar's death. Among these were allegations that Americare failed to "[p]rovide adequately trained medical staff who were capable of meeting the needs of" Ms. Farrar and that they failed to "[p]rovide trained personnel sufficient in skill and number to provide necessary and adequate care" to Ms. Farrar. Plaintiffs sought compensatory and punitive damages.

Both parties moved for a summary judgment. The trial court denied Defendants a summary judgment and granted Plaintiffs a partial summary judgment based on its finding that "[t]he defendants deviated from accepted standards of professional practice" in failing to assess Ms. Farrar, failing to appropriately and timely notify Dr. Tamula of Ms. Farrar's constipation, negligently administering enemas to Ms. Farrar, and failing to administer medications ordered by Ms. Farrar's attending physician. The trial court, however, ruled that there was a genuine issue of material fact regarding causation.

The case was tried to a jury over a ten-day period in April 2010. At the close of the proof, the trial court granted Plaintiffs' motion for directed verdict, finding as a matter of law that the following twenty-one acts or omissions constituted a breach of the applicable standard of care:

• Ms. Steelman's administration of an enema to Ms. Farrar on May 29, 2004, when signs of a bowel obstruction were present;

_____

[2] Dr. Robin explained that "mottled" is a "sort of bluish red kind of discoloration that is seen with very low blood pressure and frequently seen before death."

-4-

- Ms. Steelman's failure to follow Dr. Tamula's orders on May 27, 2004, by giving two ounces of milk and two ounces of molasses rather than six ounces of milk and six ounces of molasses;
- Ms. Hunt's failure to notify Dr. Tamula of the changes in Ms. Farrar's condition regarding her constipation on May 22, 24, and 25, 2004;
- Ms. Hunt's failure to administer MiraLAX at 8:00 a.m. every day during April 2004, in the absence of a doctor's order directing that the medication be given as needed;
- Ms. Hunt's failure to administer MiraLAX at 8:00 a.m. every day during May 2004, in the absence of a doctor's order directing that the medication be given as needed;
- Ms. Steelman's failure to chart the type, volume, and results of the enema given on May 27, 2004;
- Ms. Hunt's failure to highlight ambiguous doctor's orders and contact Dr. Tamula for a clarification;
- Ms. Hunt's failure to document each time Ms. Farrar allegedly refused MiraLAX;
- Ms. Hunt's failure to administer MiraLAX every morning at 8:00 a.m. during December 2003 as ordered by Dr. Tamula;
- Ms. Hunt's and/or Ms. Steelman's failure to document telephone orders received from physicians;
- Ms. Hunt's changing Ms. Farrar's order for MiraLAX to PRN[3] without documentation or a corresponding order from a physician;
- Ms. Hunt's and Ms. Steelman's failure to call Dr. Tamula's office to obtain criteria to use when an order was allegedly changed to PRN;
- The unauthorized taking by Mary Gutierrez, a Celebration Way caregiver, of Dr. Tamula's May 27, 2004 order for enemas;
- Ms. Hunt's administration of Fleet suppositories on May 24, 2004, without an accompanying order authorizing administration of over-the-counter medications;
- Ms. Hunt's and/or Ms. Steelman's failure to notify Dr. Tamula when Ms. Farrar's condition changed with respect to her documented incontinence in November 2004;
- Ms. Steelman's failure to recommend on May 29, 2004 that Ms. Farrar go to the emergency room;
- Ms. Hunt's failure to prepare a Request for Physician Service Form and to ask Dr. Tamula to address whether MiraLAX was intended to be made PRN;
- Ms. Hunt's and/or Ms. Steelman's failure to notify Dr. Tamula before May 24, 2004, that Ms. Farrar had not had a bowel movement for a week;
- Ms. Hunt's failure on May 25, 2004, to assess Ms. Farrar for the purpose of determining whether she was still constipated;
- Ms. Hunt's failure on May 26, 2004, to notify Dr. Tamula about Ms. Farrar's constipation; and

---

[3] "PRN" is medical shorthand for "as needed" or "whenever necessary."

• Ms. Steelman's failure on May 29, 2004, to percuss Ms. Farrar's abdomen before administering an enema.

The trial court held that the cause of Ms. Farrar's death was sepsis resulting from a perforated colon, but that it was "for the jury to determine what caused that perforation." The trial court instructed the jury that, as a matter of law, both Shelbyville Residential, LLC and Americare were "legally responsible for any compensatory damages for which Dottie Hunt and Mary Ann Steelman are legally responsible."

The jury returned a verdict in favor of Plaintiffs, assessing fault as follows: Ms. Steelman, thirty percent at fault; Ms. Hunt, twenty percent at fault; and Americare, fifty percent "at fault [for] failing to provide sufficient personnel at Celebration Way"[4] at or around the time of Ms. Farrar's death.[5] The jury awarded compensatory damages in the amount of $300,000. The jury also found that Plaintiffs proved by clear and convincing evidence that Ms. Steelman, Ms. Hunt, and Americare "acted either intentionally, recklessly, maliciously, or fraudulently as those terms were defined . . . in the jury instruction on punitive damages," thus triggering a second, bifurcated punitive damages proceeding. Following the hearing on the punitive damages issue, the jury awarded punitive damages in the amount of $10,000 against Ms. Steelman; $5,000 against Ms. Hunt; and $5,000,000 against Americare. The trial court approved the jury verdict as thirteenth juror, finding that the evidence preponderated in favor of the verdict in all regards, and entered judgment accordingly.

Americare appealed, raising four issues in support of its argument that it should not have been held directly liable for failing to provide adequate staff at Celebration Way.[6] The

---

[4] The written jury verdict form specifically asked the jury "Was Defendant Americare Systems, Inc., at fault in failing to provide sufficient personnel at Celebration Way in Shelbyville, Tennessee, at or around the time of the death of Mable Frances Farrar?" The verdict form further instructed the jury to assess fault against Americare "only to the degree that you find fault based on a failure to provide sufficient personnel at Celebration Way."

[5] Shelbyville Residential, LLC was not included on the verdict form. The final order was amended to provide that Shelbyville Residential, LLC was "zero percent at fault, that Shelbyville Residential, LLC is not liable to the Plaintiffs other than for the negligence of Mary Ann Steelman and Dottie Hunt."

[6] The Court of Appeals listed the four issues raised by Americare to that court as follows: (1) "Whether the judgment against Americare should be reversed because the plaintiffs failed to present expert testimony or other evidence to establish the applicable standard of care regarding appropriate staffing levels for an assisted living facility"; (2) "Whether the judgment against Americare should be reversed because the plaintiffs failed to present expert testimony or other evidence that Americare deviated from the applicable

(continued...)

Court of Appeals reversed the jury verdict, finding there was "no material evidence to support the conclusion that it was more probable than not that Ms. Farrar's death was caused by staffing decisions made by Americare." *Wilson*, 2012 WL 32106, at *9. All other issues were pretermitted. *Id.* We granted Plaintiffs' application for permission to appeal.

## II.

In reviewing a properly approved jury verdict, an appellate court may set aside findings of fact by a jury in civil actions "only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). In determining whether "there is material evidence to support the jury verdict, we 'take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence.'" *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010) (quoting *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006)). Applying this standard, this Court must reverse the Court of Appeals' decision and reinstate the jury verdict if we find that Plaintiffs presented material evidence that Americare's failure to provide adequate staffing at Celebration Way caused or contributed to Ms. Farrar's death. *Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009) ("If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury.").

To prevail at trial, Plaintiffs were required to prove "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause." *Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005); *accord Barkes*, 328 S.W.3d at 834. As to the causation in fact inquiry, we have observed that "[i]t is not necessary that the defendants' act be the *sole* cause of the plaintiff's injury, only that it be *a* cause." *Hale*, 166 S.W.3d at 718. Regarding the proximate cause inquiry, we have adopted a three-pronged test requiring the plaintiff to demonstrate that

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the

---

[6](...continued)
standard of care"; (3) "Whether the judgment against Americare should be reversed because the plaintiffs failed to meet their burden of proving that any purported negligence/recklessness on the part of Americare caused or contributed to their mother's death"; and (4) "Whether th[e] court should set aside or reduce the amount of punitive damages assessed against Americare." *Wilson v. Americare Sys., Inc.*, No. M2011-00240-COA-R3-CV, 2012 WL 32106, at *7 (Tenn. Ct. App. Jan. 5, 2012).

negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Id.* at 719 (quoting *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994)).

It is well established that "[c]ause in fact and proximate cause are 'ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome.'" *Hale*, 166 S.W.3d at 718 (quoting *Haynes*, 883 S.W.2d at 612); *see also McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991); *Pullins v. Fentress Cnty. Gen. Hosp.*, 594 S.W.2d 663, 671 (Tenn. 1979). Where the evidence supports more than one reasonable conclusion, causation in fact and proximate causation are issues of fact which should be decided by the jury and not the appellate court. *Pullins*, 594 S.W.2d at 671. The issue of allocation of comparative fault is also a determination of fact to be made by the jury. *Hale*, 166 S.W.3d at 718. With these standards in mind, we review the evidence presented to the jury.

First, Plaintiffs presented material evidence from which the jury could reasonably conclude that Americare provided insufficient staffing to meet the needs of the residents at Celebration Way, and that Americare was aware of the understaffing problem. Ms. Steelman testified that she made Americare aware that there was not enough staff at the facility. Plaintiffs presented the following excerpt from Ms. Steelman's video deposition regarding her communication with Maureen Meyer, Americare's regional operations director and Ms. Steelman's direct supervisor:

> Q: Have you ever mentioned to Ms. Meyer that – in terms of the responsibilities that you and Ms. Hunt have, that it's too much for the level of staffing?
> A: They are aware of it.
> Q: My question was: Did you mention it to them?
> A: Yes, sir.
> Q: When did you begin letting them know that *in terms of what you needed to do for the patients there just wasn't enough staff to get it done*?
> A: . . . [T]hey've always asked at the meetings what they could do to take some of the stuff off of us, but there's never been a solution to taking care of it.
> Q: Before October 13th, 2003, *did you let the people at Americare Systems know that you didn't have enough staff to get the job done right for the patients*?

A: *Yes, sir.*

Q: How did you communicate that information to them?

A: They just knew — they just know that our plate is very full. I mean . . .

Q: How did you communicate to Americare Systems that there was too much to do and too few staff to get the job done?

A: I discussed it.

Q: With whom?

A: With Ms. Meyer[].

Q: Anybody else?

A: No, sir.

Q: Did you ever send her any memos?

A: No, sir.

. . . .

Q: Always face-to-face?

A: Yes, sir, or on the phone.

Q: Okay. And how did you communicate it to her? What examples did you give? What problems did you identify? How did you pass that message on to her?

A: Just that our workload is overwhelming sometimes.

Q: Okay. So why didn't you just add some more staff, get another licensed nurse?

A: It's not budgeted.

(Emphasis added). Americare's decision not to hire additional staff was money-driven, according to Ms. Steelman:

Q: [I]f the problem is that there's too much work for the available staff, you've never sought additional licensed personnel, and you can hire additional unlicensed personnel, why haven't you done it?

A: I try. I try.

. . . .

Q: If you've had a hard time in getting additional personal care attendants to come to work, why haven't you tried to fix that by hiring licensed people instead of personal care attendants who are unlicensed, even on a part-time basis, you know, hire an LPN for half a day? Why haven't you tried that?

A: Because it wasn't something that I thought would be allowed.

Q: By whom?

A: By the corporation.

Q: Why did you think they wouldn't let you do it?

A: Because of the money difference.

Q: Well, what messages have they ever sent to you that they wouldn't let you do something that was more expensive?

A: Just for budget purposes.

Maureen Meyer, Americare's regional operations director, was responsible for supervising the Celebration Way facility; recruiting, hiring, and training the administrator; consulting with the director of nursing; and doing quality control by auditing patient charts. Regarding understaffing, Ms. Meyer testified as follows:

Q: You heard the testimony . . . of Mary Ann Steelman when she said that there was too much work for the level of staffing.

A: Yes, sir.

Q: And that she told you that.

A: Yes, sir.

Q: And that you are Americare.

A: Yes, sir.

Q: And that – Let me just make sure I understand something. Mary Ann Steelman and Dottie Hunt in the course and scope of their employment for Celebration Way.

A: Yes.

Q: Controlled by Americare, Inc.

A: Managed by Americare, Inc.

. . . .

Q: You heard her [Ms. Steelman] say that. You also heard [her] testify there were not enough people to get the job done?

A: Yes, I heard that.

Q: She told you that.

A: We've had multiple conversations about staffing.

Q: She says — Mary Ann Steelman says that, you, Americare, knew that Celebration Way's plate was very – and I'm using the word very underscored – full.

A: I would totally agree that their plates are full.

Q: Told you, Americare, that the work was overwhelming.

A: Yes.

The only two licensed nurses on the Celebration Way staff were Ms. Steelman and Ms. Hunt. Ms. Steelman testified that she and Ms. Hunt were "always" on call, "twenty-four hours a day." Ms. Meyer testified that the two licensed nursing professionals "covered a lot of shifts" and that they were not paid overtime compensation because they were salaried employees.

-10-

Second, Plaintiffs presented material evidence supporting the conclusion that the lack of adequate staffing at Celebration Way led to lapses and deviations from the applicable standard of care. The trial court ruled that there were twenty-one acts or omissions that constituted a breach of the standard of care. The evidence presented to the jury supports a rational inference that Americare's failure to staff Celebration Way with adequate personnel to meet the needs of its patients contributed to Ms. Farrar's death. It is a matter of reason and common sense within the jury's fact-finding province to infer that, in an employment setting, if there is too much work required of too few employees, either the work will not get done or the quality of the work will be diminished. *See Estate of French v. Stratford House*, 333 S.W.3d 546, 558 (Tenn. 2011) (claims that the failure of nursing home staff "to provide basic services resulted, at least in part, from chronic understaffing of which senior management at [the defendant nursing home] was aware" present a case where "the trier of fact could assess the merits of the claim based upon everyday experiences"); *see also Anderson v. City of Atlanta*, 778 F.2d 678, 685-86 (11th Cir. 1985) (holding that "[t]he jury could reasonably find that a policy of understaffing resulted in the unavailability of medical personnel and prevented individual officers from being able to do their tasks properly," and that the defendant city "knew or should have known that the natural consequence of this failure to adequately staff the jail would impair proper medical care and attention necessary to protect the health of pre-trial detainees"); *Bremenkamp v. Beverly Enters.-Kan., Inc.*, 762 F. Supp. 884, 892-93 (D. Kan. 1991) (evidence of understaffing presented question of fact for jury on plaintiff's claim that nursing home resident's injury was proximately caused by failure to adequately staff nursing home); *HCA Health Servs. of Midwest, Inc. v. Nat'l Bank of Commerce*, 745 S.W.2d 120, 125 (Ark. 1988) (proof of understaffing in hospital nursery room supported inference and jury verdict that inadequate staffing caused newborn's injury).

Both Ms. Steelman and Dr. Robin testified that the standard of care required that only licensed nurses were permitted to take telephone orders from a doctor's office. However, Dr. Tamula's May 27, 2004 order prescribing enemas for Ms. Farrar was taken over the telephone by Mary Gutierrez, a nonlicensed staff member, because no licensed nurses were at the facility. Dr. Tamula testified that she "was not very comfortable when [she] found out that there was nobody there" who could administer the prescribed enemas "until 10:00 p.m. that night." Ms. Gutierrez testified that when they needed a nurse and one was not on duty, they would call the nurses at home and "[s]ometimes they answered and sometimes they didn't, and sometimes we never got a return phone call." She described an earlier incident arising from her phone call to Ms. Steelman at home:

> Earlier in time before this incident she [Ms. Steelman] had gotten angry with me because I had called her at home. I had let her know when I first started there that I wasn't comfortable giving medicine to people because I was a person off the street, no certification, no nothing. And she had left a note one

night for me to give somebody some medication, and I called. She left a note, and I called her, and she said, "Can you not read?" And I said, "Yes, ma'am, I can, but you're asking me to do something that I'm not comfortable doing so I'm calling to make sure I hear it from you, not a piece of paper." So she stated, "You don't need to call me for everything." And it just made me feel like, you know, this is not right because I was uncomfortable as it was to give medication out not being certified or trained to do all of that.

According to the nursing records presented by Celebration Way, Ms. Farrar received significantly fewer doses of MiraLAX than Dr. Tamula prescribed. Ms. Farrar was required to have one dose every morning to prevent constipation, but she received none in March 2004 and only six doses in April. Evidence presented at trial suggested that Celebration Way actually gave Ms. Farrar far fewer doses of MiraLAX than were recorded in its nursing records. The owner of Reeves-Sain Pharmacy testified that during the time Ms. Farrar was living at Celebration Way, his pharmacy had an agreement with Celebration Way to provide medications for the facility residents. Based on Reeves-Sain Pharmacy's records, only one standard size bottle of MiraLAX, containing fifteen doses, was ordered and delivered on October 13, 2007 for Ms. Farrar. There was no record of another order by Celebration Way or dispensation by Reeves-Sain Pharmacy of MiraLAX for Ms. Farrar. Ms. Hunt admitted that Reeves-Sain "won't send them another MiraLAX until I order it." Defendants presented no proof suggesting that MiraLAX would have come to Celebration Way for Ms. Farrar from any other source but Reeves-Sain Pharmacy. Dr. Robin, after reviewing Ms. Farrar's medical records and other pertinent documents, testified that Celebration Way's "recordkeeping was fraudulent." Thus, the jury could have reasonably concluded that the staff at Celebration Way chronically neglected its duty to give Ms. Farrar her prescribed MiraLAX. Dr. Robin testified that it was "absolutely foreseeable" that Ms. Farrar would have become constipated without the MiraLAX administered as ordered in April and May 2004.

Further, when Ms. Steelman arrived at Celebration Way on May 29, 2004, she was irritated, upset, and, in her own word, "flustrated." Ms. Steelman had recently finished working a nearly twelve-hour shift from 10:00 p.m. on Friday, May 28 to 9:30 a.m. on Saturday, May 29th. She testified that she covered the shift that night for an absent employee. It was the Saturday of Memorial Day weekend and she and her family had been boating "on the lake"[7] when she received the call from Ms. Watson to come in and give Ms. Farrar the enema. Several witnesses attested that they heard Ms. Steelman say angrily that she was going to give Ms. Farrar the enema "so she'll shit and they'll shut up," a statement Ms. Steelman did not deny making. Ms. West testified that she witnessed Ms. Steelman

_____

[7] Ms. Steelman did not testify as to what lake they were boating on, but only that it was about thirty minutes from the Celebration Way facility.

filling the enema bottle, which had a capacity of sixty-four ounces, and that after she had filled it, the bottle "was filled to the brim." At trial, Ms. Steelman did not deny saying that she was "going to give her the whole damn thing to shut her up."[8] Dr. Robin testified that to have given an enema of sixty-four ounces under the circumstances would be "an outrageous violation of the standard of care." Ms. Steelman proceeded to administer the enema, and shortly thereafter, Ms. Farrar died from a perforated colon.

Ms. Steelman failed to take the time to properly chart the type, volume, and results of the enema she gave Ms. Farrar on May 27, 2004. She failed to see that the three or four enemas per day ordered by Dr. Tamula were given. No one at the facility notifed Dr. Tamula that Ms. Farrar was constipated even though Dr. Tamula's order directed them to notify her if Ms. Farrar became constipated. Dr. Robin described the care given to Ms. Farrar in this case as "very reckless" and "outrageous." When asked why she used the term "outrageous" to describe the care and treatment given Ms. Farrar, Dr. Robin replied:

> Because it would have been so easy to do the right thing. It would have been so easy to obtain the MiraLAX, so easy to administer it per order, so easy to call Dr. Tamula if there was a problem. It just – I don't really see any reason for the type of care that she received.

Finally, Plaintiffs presented material evidence supporting the conclusion that the deviations from the applicable standard of care were substantial factors in Ms. Farrar's death. According to Dr. Robin, the nurses' failure to give Ms. Farrar the prescribed MiraLAX every day caused her to become constipated. As a result of the constipation and fecal impaction, Ms. Farrar needed to have multiple enemas. The enemas, however, were not given as directed. Instead of giving Ms. Farrar three to four enemas a day, the nursing staff at the facility only gave Ms. Farrar one enema Thursday night and then a final, fatal enema on Saturday night. Dr. Tamula testified that the likely cause of Ms. Farrar's death was colon perforation due to the enema.

As the above summary indicates, there was material evidence supporting a reasonable conclusion that Americare chronically understaffed Celebration Way, and that Americare was aware of the problem—including the testimony of Celebration Way's Administrator, Ms. Steelman, that she "let the people at Americare Systems know that [she] didn't have enough staff to get the job done right for the patients," that "there was too much to do and too few staff to get the job done," and their "workload is overwhelming sometimes." Plaintiffs also established chronic, numerous, and egregious violations of the standard of care by Celebration Way staff in their care and treatment of Ms. Farrar, including repeated failures

---

[8] Ms. Steelman stated, "[I]f I said it, I didn't mean anything by it. And I don't recall saying it."

to give her prescribed doses of MiraLAX, which led to her constipated and impacted condition, and the twenty-one acts or omissions established as violations as a matter of law by the trial court's directed verdict, none of which have been challenged on appeal. Further, Plaintiffs established a causal relationship between the violations of the standard of care and Ms. Farrar's death.

Causation is a question of fact for the jury. *Hale*, 166 S.W.3d at 718; *McClenahan*, 806 S.W.2d at 775; *Pullins*, 594 S.W.2d at 671. It is the jury's province to determine the facts and the inferences to be drawn from them. *Conaway v. N.Y. Life Ins. Co.*, 102 S.W.2d 66, 68 (Tenn. 1937); *see also Martin v. Washmaster Auto Ctr., U.S.A.*, 946 S.W.2d 314, 317 (Tenn. Ct. App. 1996) ("The jury is permitted to reasonably infer facts from circumstantial evidence, and these inferred facts may be the basis of further inferences of the ultimate fact at issue."). The question is whether the proof, taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and discarding all countervailing evidence, *see Barkes*, 328 S.W.3d at 833, amounted to material evidence supporting the jury's finding that Americare's understaffing was more probably than not a substantial factor in bringing about Ms. Farrar's death. *See Hale,* 166 S.W.3d at 719. We conclude that material evidence supported the jury's finding that Americare's conduct was a substantial factor in causing Ms. Farrar's death.[9]

## III.

Because we find that the jury's verdict is supported by material evidence, we reverse the decision of the Court of Appeals and reinstate the jury verdict. This case is remanded to the Court of Appeals for review of the award of punitive damages against Americare. Costs on

---

[9] Plaintiffs presented the testimony of medical experts, including Dr. Robin, Dr. Tamula, and Registered Nurses Steelman and Meyer, to support their claim of Americare's understaffing. Because we hold that the Plaintiffs presented material evidence that understaffing by Americare was a substantial factor in causing Ms. Farrar's death, we need not address Americare's arguments that the judgment against Americare should be reversed because Plaintiffs failed to present expert testimony or other evidence to establish the applicable standard of care regarding appropriate staffing levels for an assisted living facility and that Plaintiffs failed to present expert testimony or other evidence that Americare deviated from the applicable standard of care. Further, we need not address the question of whether expert testimony was required in this case because Plaintiffs presented sufficient proof, including expert testimony, to support their claim of understaffing.

appeal are assessed to the appellee, Americare Systems, Inc., for which execution may issue if necessary.

_____

SHARON G. LEE, JUSTICE