IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 4, 2013

## RHEATTA F. WILSON, ET AL. v. AMERICARE SYSTEMS, INC., ET AL.

**Appeal from the Circuit Court for Bedford County**
**No. 10204      Franklin L. Russell, Judge**

_____

**No. M2013-00690-COA-RM-CV - Filed February 25, 2014**

_____

A defendant appeals the award of punitive damages arising from the death of a patient at an assisted living facility, which the defendant managed. We affirm the trial court's review of the *Hodges* factors and the due process analysis relating to the punitive damage award. We also affirm the trial court's directed verdict making the defendant liable for the actions of the assisted living facility's employees. We must modify the amount of the punitive damage award by reducing it to comply with the amount the plaintiff requested in the ad damnum clause of their complaint.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed
as Modified**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P. J., M. S., and RICHARD H. DINKINS, J., joined.

Roger W. Dickson and Robert F. Parsley, Chattanooga, Tennessee; and David L. Johnson, Nashville, Tennessee for the appellant, Americare Systems, Inc.

C. J. Gideon, Jr. and Alan S. Bean, Nashville, Tennessee; and Raymond W. Fraley, Jr., Fayetteville, Tennessee, for the appellees, Rheaetta F. Wilson and Lauralyn F. Watson.

OPINION

BACKGROUND

The history of this case is set out in the Supreme Court's recent opinion in *Wilson v. Americare Systems, Inc.*, 397 S.W.3d 552 (Tenn. 2013). The matter involves the death of

Mable Farrar at Celebration Way, an assisted living facility in Shelbyville, Tennessee. As the Supreme Court observed,

> The suit alleged that the negligence of the staff, the owner, and its management company caused Ms. Farrar's death. The jury returned a verdict finding the nurse thirty percent at fault, the director of nursing twenty percent at fault, and the management company fifty percent at fault based on its failure to provide sufficient personnel at the facility. The management company appealed. The Court of Appeals reversed the jury verdict against the management company, finding that there was no material evidence that staffing deficiencies proximately caused Ms. Farrar's death.

*Id*. at 553-54. The Supreme Court held that the jury's verdict was supported by material evidence and reversed the decision of the Court of Appeals. The Supreme Court remanded the case to the Court of Appeals for review of the award of punitive damages.

> The Supreme Court also stated:

> The jury also found that Plaintiffs proved by clear and convincing evidence that Ms. Steelman, Ms. Hunt, and Americare "acted either intentionally, recklessly, maliciously, or fraudulently as those terms were defined . . . in the jury instruction on punitive damages," thus triggering a second, bifurcated punitive damages proceeding. Following the hearing on the punitive damages issue, the jury awarded punitive damages in the amount of $10,000 against Ms. Steelman; $5,000 against Ms. Hunt; and $5,000,000 against Americare. The trial court approved the jury verdict as thirteenth juror, finding that the evidence preponderated in favor of the verdict in all regards, and entered judgment accordingly.

*Id*. at 557.

## STANDARD OF REVIEW

Tennessee has recognized awards of punitive damages since at least 1840. *See Wilkins v. Gilmore*, 21 Tenn. 140, 141 (1840); Glynna K. Parde, Case Comment, 23 MEM. ST. U. L. REV. 239, 240 (1992). However, today's laws and procedures governing punitive damages date to *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992).

*Hodges* determined that "a court may henceforth award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Id*. at 901. Futhermore, "a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence." *Id*. "Clear and convincing evidence" refers to "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id*. at 901 n.3. "In a trial

where punitive damages are sought, the court, upon motion of defendant, shall bifurcate the trial. During the first phase, the factfinder shall determine (1) liability for, and the amount of, compensatory damages and (2) liability for punitive damages in accordance with the standards announced above." *Id.* at 901.

> If, in the first hearing, the factfinder determines that:
>
> a defendant [is] liable for punitive damages, the amount of such damages shall then be determined in an immediate, separate proceeding. During this second phase, the factfinder shall consider, to the extent relevant, at least the following:
>
> (1) The defendant's financial affairs, financial condition, and net worth;
> (2) The nature and reprehensibility of defendant's wrongdoing, for example
> (A) The impact of defendant's conduct on the plaintiff, or
> (B) The relationship of defendant to plaintiff;
> (3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
> (4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;
> (5) The expense plaintiff has borne in the attempt to recover the losses;
> (6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;
> (7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;
> (8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and
> (9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.
> The trier of fact shall be further instructed that the primary purpose of a punitive award is to deter misconduct, while the purpose of compensatory damages is to make plaintiff whole.
> After a jury has made an award of punitive damages, the trial judge shall review the award, giving consideration to all matters on which the jury is required to be instructed. The judge shall clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed.

*Id.* at 901-02. These factors have come to be known as the "*Hodges* factors." *McLemore ex rel. McLemore v. Elizabethton Med. Investors, Ltd. P'ship*, 389 S.W.3d 764, 780 (Tenn. Ct. App. 2012). When we review the trial court's findings under the *Hodges* factors, we

3

presume the factual findings are correct, unless the evidence preponderates otherwise. *Id*. at 777.

After *Hodges*, another layer of analysis was added due to the United States Supreme Court case of *BMW of North America, Inc.v. Gore*, 517 U.S. 559 (1996). As explained in *Flax v. DaimlerChrysler Corp*., 272 S.W.3d 521 (Tenn. 2008):

> The Court [in *Gore*] concluded that due process requires that "a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." Accordingly, the Court adopted three guideposts for determining whether a defendant has adequate notice of the magnitude of the sanction that may be imposed. The first and most important guidepost is the reprehensibility of the defendant's conduct. The Court indicated that the presence of violence, deceit, reckless disregard for the safety of others, or repeated misconduct may be aggravating factors that increase the reprehensibility of the defendant's conduct. The second guidepost is the ratio between the punitive damage award and the actual harm suffered by the plaintiff. Although the Court declined to adopt any strict mathematical formula, it repeated the suggestion from a previous case that "a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line'" of constitutional impropriety. The final guidepost requires courts to compare the punitive damage award to civil or criminal penalties that could be imposed for similar conduct. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'" These legislative judgments are relevant because they provide defendants with notice of the severity of the penalty that may be imposed upon them.

*Id*. at 537 (internal citations omitted). "When deciding whether a punitive damages award is excessive to the point that it transgresses constitutional due process standards, our review is de novo to ensure that the award is based on an application of the law rather than the jury's caprice." *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 190 (Tenn. 2009) (citing *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).

ANALYSIS

Punitive damages may be assessed only if the court finds that "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges*, 833 S.W.2d at 901. The jury answered "yes" to the question of whether Americare acted either intentionally, recklessly, maliciously or fraudulently. Americare denies that there is material evidence to support an award of punitive damages for any of these four categories. We must review the record to determine whether there is material evidence to support the jury's finding that there is no serious or substantial doubt that Americare acted recklessly or

4

fraudulently. *Goff*, 297 S.W.3d at 187.

Is there material evidence Americare acted recklessly? "A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Hodges*, 833 S.W.2d at 901. Americare maintains that there is no clear and convincing evidence of the standard of care. The Supreme Court addressed this concern in footnote 9 of its opinion:

> Plaintiffs presented the testimony of medical experts, including Dr. Robin, Dr. Tamula, and Registered Nurses Steelman and Meyer, to support their claim of Americare's understaffing. Because we hold that the Plaintiffs presented material evidence that understaffing by Americare was a substantial factor in causing Ms. Farrar's death, we need not address Americare's arguments that the judgment against Americare should be reversed because Plaintiffs failed to present expert testimony or other evidence to establish the applicable standard of care regarding appropriate staffing levels for an assisted living facility and that Plaintiffs failed to present expert testimony or other evidence that Americare deviated from the applicable standard of care. Further, we need not address the question of whether expert testimony was required in this case because Plaintiffs presented sufficient proof, including expert testimony, to support their claim of understaffing.

*Wilson*, 397 S.W.3d at 564 n.9. As we interpret the Supreme Court's statement, the standard of care, or duty owed Ms. Farrar, was to staff the facility adequately. The proof showed that staffing was not adequate, hence, the standard or duty was not met. We find the proof to be clear and convincing.

Americare also claims that the plaintiffs did not show that Americare disregarded a substantial and unjustifiable risk. This claim is directly contradicted by our Supreme Court's finding that:

> there was material evidence supporting a reasonable conclusion that Americare chronically understaffed Celebration Way, and that Americare was aware of the problem—including the testimony of Celebration Way's Administrator, Ms. Steelman, that she "let the people at Americare Systems know that [she] didn't have enough staff to get the job done right for the patients," that "there was too much to do and too few staff to get the job done," and their "workload is overwhelming sometimes."

*Id*. at 563.

We conclude that there is material evidence that Americare's conduct was reckless and, after review of the record, we also conclude that the evidence of recklessness is clear

5

and convincing.[1]

Did Americare act fraudulently? "A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation." *Hodges*, 833 S.W.2d at 901. At the conclusion of the proof, the plaintiffs moved for and were granted a directed verdict "that any liability that results from the actions of Celebration Way employees is imputable and will be imputed to Americare." The record leaves no doubt that employees of Celebration Way kept fraudulent records as to the number of doses of Miralax that Ms. Farrar received. The records reflected approximately 85 doses being provided to Ms. Farrar from October 2003 through May 2004, yet only one 15-dose bottle of Miralax had been delivered to the facility from October to June. The evidence is both material and clear and convincing that the patient records were false—too false to be a mistake. That fraud is attributable to Americare under the court's directed verdict and, furthermore, the material evidence is clear and convincing that Americare's understaffing was at least part of the reason for the fraud.

Next, Americare maintains that the "*Hodges* factors" do not justify the amount of the punitive damage award. We will address each factor below.

*(1) The defendant's financial affairs, financial condition, and net worth*

Americare maintains that the plaintiffs did not present evidence of Americare's net worth. The trial court noted that the plaintiffs did produce evidence of the management fees and income from Celebration Way that flowed to Americare. In addition, a *St. Louis Business Journal* article from 1998 was entered into evidence, without objection from the defendants,[2] that stated Americare's gross sales were $47,000,000.00.

*(2) The nature and reprehensibility of defendant's wrongdoing, for example*
*(A) The impact of defendant's conduct on the plaintiff, or*
*(B) The relationship of defendant to plaintiff*

As the trial judge put it, "The impact of the wrongdoing, put in the simplest terms, is that the defendants killed the patient." The defendants contracted to assist Ms. Farrar in her daily life and in the maintenance of her health. Yet, over an extended period of time—October 2003 to May 2004—they failed to provide her with the prescribed doses of medicine

---

[1]Our conclusion, and the findings of the Tennessee Supreme Court quoted above, negate any need for this Court to address Americare's issue that "Plaintiffs did not present sufficient evidence showing that Ms. Farrar died as a result of any alleged recklessness or fraud on the part of Americare."

[2]Parties who desire to object to the admission of evidence must make their objection in a timely manner and must state the specific basis for their objection. *McLemore*, 389 S.W.3d at 783.

and falsified her chart.   These problems are linked to Americare's understaffing of the facility.

*(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm*

The trial judge found that "Americare was well aware, from their Shelbyville personnel, that more skilled personnel were needed to provide proper care for Ms. Farrar and the other residents at Shelbyville Residential."  Americare had been made aware by Ms. Steelman that she did not have sufficient staff to "get the job done right for the patients." Ms. Steelman testified that budget reasons were given as the reason for not hiring more staff.

*(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct*

The failure to administer Miralax to Ms. Farrar in the doses prescribed extended over months and was falsified in her chart.  Americare's understaffing of the facility is at least partly to blame.

*5) The expense plaintiff has borne in the attempt to recover the losses*

The trial judge found:

An exact figure for these expenses is not available in the record, but this trial judge is aware that an enormous amount of discovery was taken by Plaintiffs' counsel in this case, that considerable expert testimony had to be developed and the expense of it paid, that an appeal on this issue of arbitration had to be opposed, that depositions were taken in a form that could present witnesses at trial by video (and that a separate individual had to be present at trial to display the video evidence on demand), that numerous motion hearings were conducted, and that the trial lasted a full two weeks (ten trial days).[3]

*(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior*

The trial judge found that there is no evidence of exactly how much net profit to any party resulted from negligently holding down the cost of skilled personnel and by providing

---

[3]The trial court's findings on the *Hodges* factors were entered October 1, 2010.  Americare points to the fact that the plaintiffs had presented proof of a total of $25,147.30 in litigation expenses.  This presentation of proof of expenses by plaintiffs' counsel, Mr. Gideon, included only "deposition fees, expert fees, travel and all of those things of that nature . . . ."  It did not include the expense of attorney and paralegal time, which would have been considerable and which the trial judge was clearly taking into account.

insufficient care to Ms. Farrar or other patients.

*(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act*

No evidence was presented of such prior punitive damage awards.

*(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused*

The trial court observed that, even through the second phase of the trial, the defendants' witnesses remained defiant and insisted that they did not cause Ms. Farrar's death. The court also noted that "there was evidence of negotiations but no convincing proof that a true offer of settlement was made which was in line with the compensatory damages ultimately awarded." Americare points out a November 19, 2008 email offering the "current amount left under the policy . . . $318,879.97." We note that this offer occurred four and one half years after Ms. Farrar's death and just over four years after the lawsuit was filed, so it certainly was not prompt.

*(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award*

The trial court found the defense witnesses lacked candor and remorse.

The trial court reviewed the *Hodges* factors carefully and concluded that the jury was correct in returning judgments for punitive damages in this case and found that the amounts of the awards are appropriate. We cannot say that the evidence preponderates against the trial court's findings as to the *Hodges* factors.

Next we must decide whether the size of the award violates Americare's Fourteenth Amendment due process rights. *Goff*, 297 S.W.3d at 190. The United States Supreme Court has identified three guideposts to assist courts in determining whether a punitive award is grossly excessive and violates due process: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 574-75.

The United States Supreme Court has also observed that, when evaluating the reprehensibility of the defendant's conduct, courts should consider whether,

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of

8

others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident

*Goff*, 297 S.W.3d at 191-92 (quoting *Campbell*, 538 U.S. at 419). Because Ms. Farrar died in part because of understaffing by Americare, and the understaffing displayed a reckless disregard for the health and safety of the persons in its care, we have no difficulty finding that Americare's conduct was highly reprehensible.

The disparity between the actual harm suffered by the plaintiff and the punitive damages award requires a comparison between the awards of compensatory and punitive damages. Punitive damages must bear a reasonable relationship to compensatory damages. *Id.* at 193. The United States Supreme Court has stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *Campbell*, 538 U.S. at 425; *see also Gore*, 517 U.S. at 582 ("Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula . . . ."). The United States Supreme Court, however, has also indicated that "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff," and that "there are no rigid benchmarks that a punitive damages award may not surpass." *Campbell*, 538 U.S. at 425. While the United States Supreme Court has expressed skepticism about awards exceeding a single-digit ratio, *Campbell*, 538 U.S. at 425; *see also Gore*, 517 U.S. at 582-83, the Court has also indicated that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582.

The defendants note that in 2011 the Tennessee General Assembly enacted a law providing that punitive damages may not exceed the greater of $500,000 or twice the amount of compensatory damages. Tenn. Code Ann. § 29-39-104(a)(5). While the defendants admit that the law does not apply retroactively to this case, they do argue that the law is a "strong indication of the policy of this State," and shows that the punitive damages in this case are excessive in relation to the compensatory damages. We agree that the new law, if applicable, would call for a large reduction in punitive damages. In this case, however, this Court is bound by the law existing prior to the 2011 enactment. The prior law was more lenient about awards of punitive damages.

Ms. Farrar was 83 years old with a life expectancy of less than six years. The jury assessed compensatory damages totalling $300,000 and punitive damages totalling $5,015,000. This is a ratio of punitive to compensatory damages of less than 17 to 1.[4] *Goff* notes a number of decisions with higher ratios. *Goff*, 297 S.W.3d at 195. Recently, the Court

---

[4]This ratio is figured using the full awards of compensatory and punitive damages because, as a result of the trial court's directed verdict making Americare responsible for all actions of Celebration Way's employees, Americare is liable for the full amounts. *See infra*.

of Appeals upheld a ratio of 18.8 to 1. *McLemore*, 389 S.W.3d at 786-87, 790. Ms. Farrar's advanced age led to a lower assessment of compensatory damages, which can support a higher ratio of punitive damages. In light of the totality of circumstances in this matter, we do not find that the ratio of punitive damages to compensatory damages is excessive.

The final due process consideration is the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 574-75. Americare maintains that it was not penalized by the State regarding the care provided to Ms. Farrar and was not cited for understaffing. Therefore, Americare argues that this factor suggests the punitive damage award was excessive.

The plaintiffs argue that Tennessee courts give more weight to the first two considerations, citing *Flax*. In *Flax*, our Supreme Court observed:

> Although we are somewhat unsure how to reconcile the third guidepost with the first two, we are inclined to give the first two guideposts considerably more weight. The United States Supreme Court has held that the first guidepost is the most important and has never stated that the third guidepost is dispositive. Furthermore, we are unaware of any state or federal case that has invalidated a punitive damage award solely because the award was greater than that contemplated by statutory penalties.

*Flax*, 272 S.W.3d at 540. Based on *Flax*, the *McLemore* court gave "more weight to the first two guideposts than the third, as the possible civil penalties discussed by the parties on appeal are speculative . . . ." *McLemore*, 389 S.W.3d at 790. No civil penalties were assessed by the State against Americare – a factor at odds with the other two due process factors. Like the courts in *Flax* and *McLemore*, we give more weight to the first two factors. We find that the size of the punitive damage award does not violate due process.

*Directed Verdict finding Americare Vicariously Liable for the Acts of Celebration Way Employees*

At the close of proof, the plaintiffs moved for a directed verdict finding Americare responsible for the acts of the employees of Celebration Way. The trial court granted the motion. Appellate review of a directed verdict has been articulated by our Supreme Court:

> This Court reviews the trial court's decision to grant a directed verdict de novo, applying the same standards as the trial court. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003). We will affirm a directed verdict "only when the evidence in the case is susceptible to but one conclusion." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (citing *Eaton* [*v. McLain*], 891 S.W.2d [587, 590 (Tenn. 1994))]. We must "take the strongest legitimate view of the evidence favoring the opponent of the motion," and must accept all reasonable inferences in favor of the nonmoving party. *Id.* We may

affirm the motion "only if, after assessing the evidence according to the foregoing standards, [we] determine[ ] that reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Id.*; *see also Cecil v. Hardin*, 575 S.W.2d 268, 270 (Tenn. 1978).

*Overton v. Lowe*, No. E2012-02230-COA-R3-CV, 2013 WL 4606369, at *3 (Tenn. Ct. App. Aug. 26, 2013) (quoting *Biscan v. Brown*, 160 S.W.3d 462, 470 (Tenn. 2005)).

"The conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case and the matter is particularly within the province of the trial court." *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985). Even though parent and subsidiary corporations are viewed separately, direct liability for a subsidiary's action may be imputed to the parent corporation due to the parent's control over the subsidiary. *Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *5 (Tenn. Ct. App. 2009).

It is not necessary for one to show that he has been misled, deceived or actually defrauded, to enable him to invoke this rule. It is enough that the parent corporation's domination of the subsidiary was so complete as to make them practically indistinguishable or to make the subsidiary a mere tool, agency or instrumentality of the parent; and that he will suffer loss unless the parent be held.

*Id.* (quoting *Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*, 578 S.W.2d 625, 633 (Tenn. 1979) (citing *Tenn. Consol. Coal Co. v. Home Ice & Coal Co.*, 156 S.W.2d 454, 458 (Tenn. Ct. App. 1941)).

The evidence showed that Americare hired the administrator of Celebration Way. Americare determined the policies and procedures of Celebration Way. Employees of Americare were signatories on Celebration Way's bank accounts and those accounts were routinely accessed by Americare. Americare established the budget for Celebration Way.

Americare counters this evidence by arguing that it is not the parent company of Shelbyville Residential/Celebration Way. Although an entity called RH Montgomery Properties (which in turn is owned by Richard H. Montgomery) owns Shelbyville Residential/Celebration Way, Americare (also owned by Richard H. Montgomery) manages Shelbyville Residential/Celebration Way. Americare also argues that whatever control it had was not used to commit a wrong or affect another party's rights and that the plaintiffs did not show Americare's control played any role in Ms. Farrar's death or that the plaintiffs would suffer loss unless Americare was held liable. In our opinion, taking the strongest legitimate view of Americare's arguments, we cannot disagree with the trial court. Americare acted as a parent company and dominated Shelbyville Residential/Celebration Way. Americare's other arguments just are not legitimate.

*Ad Damnum Clause*

The plaintiffs' complaint sought $1,500,000.00 in compensatory damages and $3,000,000.00 in punitive damages against all defendants. The jury awarded punitive damages of $5,000.00 against Dottie Hunt, $10,000.00 against Mary Ann Steelman and $5,000,000.00 against Americare.

Americare argues that the punitive damages are limited by the plaintiffs' ad damnum clause. The plaintiffs, on the other hand, argue that the rule relied on by the defendants is arbitrary, arcane and contrary to modern standards of notice pleading and that professional malpractice claims were coupled with ordinary negligence claims.

"Our case law establishes that, absent a statute or rule of law to the contrary, a plaintiff is prohibited from recovering money damages in excess of the amount sought in the complaint." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 384 (Tenn. Ct. App. 2006). Our Supreme Court has observed that "[i]t is true that this Court has held that '[a] judgment or decree in excess of the amount pleaded is void,' but that is so only 'to the extent of the excess.'" *Morrison v. Allen*, 338 S.W.3d 417, 441 (Tenn. 2011) (quoting *Gaylor v. Miller*, 59 S.W.2d 502, 504 (Tenn. 1933)).

Even if the rule relied on by the defendants is arbitrary, arcane and contrary to modern standards of notice pleading, it is "well-settled." *Romine v. Fernandez*, 124 S.W.3d 599, 605 (Tenn. Ct. App. 2003). This court cannot change Tennessee Supreme Court precedent. As for the plaintiffs' second argument about medical malpractice claims, it is true that *Romine* finds a statutory exception to the rule for heathcare malpractice cases. *Id*. at 605-06 (citing Tenn. Code Ann. § 29-26-117). Americare was found at fault because of understaffing, that is, failure to provide sufficient personnel. Understaffing is a negligence claim, not a medical malpractice claim.[5]

---

[5]In *Estate of French v. Stratford House*, 333 S.W.3d 546, 558 (Tenn. 2011), the Tennessee Supreme Court found:

> The Administratrix claims that the failure of the CNAs [certified nursing assistants] to provide basic services resulted, at least in part, from chronic understaffing of which senior management at the Stratford House was aware. In our assessment, these alleged acts and omissions pertain to basic care and do not substantially relate to the rendition of medical treatment by a medical professional. Because no specialized medical skill is required to perform those tasks, the trier of fact could assess the merits of the claim based upon everyday experiences. Thus, this component of the claim sounds in ordinary negligence.

Also, we need not address whether the new definition of "health care liability action" found in Tenn. Code Ann. § 29-26-101(a)(1) applies because this action accrued before October 11, 2011.

Because "a plaintiff is prohibited from recovering money damages in excess of the amount sought in the complaint," *Newcomb*, 222 S.W.3d at 384, and because the plaintiffs sought $3,000,000.00 in punitive damages in their complaint and were awarded $5,000,000.00 against Americare, the punitive damage award against Americare must be reduced. The complaint asked for $3,000,000.00. The punitive damage awards against Hunt and Steelman totaled $15,000.00. Therefore, the punitive damages awarded against Americare must be reduced to $2,985,000.00.

CONCLUSION

The punitive damages assessed against Americare are decreased to $2,985,000.00. All other issues are affirmed. Costs are assessed against Americare, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

13