IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 7, 2021

**STATE OF TENNESSEE v. TERRY LEE MCANULTY**

**Appeal from the Circuit Court for Tipton County**
**No. 9812      Joseph H. Walker, III, Judge**

---

**No. W2021-00382-CCA-R3-CD**

---

The defendant, Terry Lee McAnulty, appeals his Tipton County Circuit Court jury conviction of aggravated vehicular homicide, arguing that the evidence was insufficient to establish that his intoxication was the proximate cause of the accident that caused the death of the victim. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

David Stockton, Assistant District Public Defender, for the appellant, Terry Lee McAnulty.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Jason R. Poyner, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In March 2019, the Tipton County Grand Jury charged the defendant, Terry Lee McAnulty, with aggravated vehicular homicide by having a blood alcohol content ("BAC") of .20 percent or more, aggravated vehicular homicide by intoxication, vehicular homicide by reckless conduct, and violating the financial responsibility law in relation to a vehicle accident that resulted in the death of the victim, Cheryl Ann Stimpson.

At the defendant's July 2020 trial, the victim's husband, Brian Stimpson, testified that on December 1, 2018, he and the victim took their 2009 Harley-Davidson Street Glide motorcycles for an afternoon ride. As they returned home on Beaver Road, the victim fell in behind Mr. Stimpson, as was her habit, "to give us more room for potholes or dead animals in the road or whatever." When the couple was "less than two miles" from

their home, they encountered a truck driving erratically. Mr. Stimpson said that the truck "gets off to his right side of the road, like he's going off the road" before trying "to compensate and get back on the road." As the truck crossed the center line, Mr. Stimpson directed his motorcycle "all the way off to the edge of the road into the grass barely." After the truck passed him, Mr. Stimpson looked back to see the truck "all the way on our side and a big cloud of dust and debris flying."

Mr. Stimpson turned his motorcycle around to go check on the victim, and by the time he arrived at the impact location some "10 or 15 seconds" later, "three or four cars already stopped behind us." Mr. Stimpson testified that the victim was lying "over in the fence" and that "the barbwire was wrapped around her." He "took her helmet off and begged for her to speak to me and say something," but the victim did not respond. The victim had suffered head trauma, and "[h]er left leg had been completely severed at the calf." Mr. Stimpson recalled that a man arrived only a few seconds later and "said I know CPR. He said, I am a paramedic and asked me to step aside." Mr. Stimpson said that he returned to his motorcycle and "started praying." Mr. Stimpson testified that the truck he had seen cross the center lane had come to rest some "60 to 80 yards" away against a "tree [that] was on our side of the road in somebody's front yard." He said that he did not even notice the driver of the truck at the scene because he was so concerned about the victim.

Mr. Stimpson said that both custom motorcycles had been "kept in tip top shape" and were "in mint condition, looked like new." Neither was leaking fluid, and neither had any damage, cosmetic or mechanical. He recalled that, at the time they encountered the truck, he and his wife were traveling at approximately 40 miles per hour. He said that nothing other than the accident could have caused the victim's death.

During cross-examination, Mr. Stimpson testified that he "[n]ever heard a tire squeal or stop once." He said that the impact of the truck and the victim's motorcycle "was a loud, very loud noise." Mr. Stimpson recalled that the driver of the truck "was definitely going faster than me" and estimated his speed at "between 50 and 55" miles per hour. Mr. Stimpson described the truck's veering onto his side of the roadway as "a hard cut coming across" rather than "a drift." He said that, after the truck passed him, "all I see is his truck" in the mirrors "as I am looking up and turning around, and then I see the collision."

Raymond Deneca, a paramedic with the Tipton County Ambulance Service, testified that he and his family were returning from a Christmas parade and light display when he came upon a motor vehicle crash on Beaver Road. He said that he first observed debris in the roadway but did not realize an accident had occurred until he "saw the victim in the ditch beside the road." Mr. Deneca exited his vehicle and went to the victim, who lay "on her back on the ditch bank with her head down, legs tangled up in the barbed wire

fencing behind her in an unnatural position." "She had a massive head trauma" and "a severe injury to her left leg," which was "mangled." The victim's "respirations were not regular, they were very shallow," and her pulse was "[v]ery weak." Mr. Deneca "called Munford Fire on the direct line myself, just because I knew that would save a little time as opposed to calling 911." Although emergency personnel arrived "within three minutes" of his 8:31 p.m. call, the victim died before their arrival.

Someone mentioned to Mr. Deneca that the vehicle that had struck the victim "was against a tree in a yard about 30 or 40 yards down the road." Mr. Deneca observed the vehicle "between the road and the house," completely off of the roadway. He did not attempt to check on the driver of the vehicle because one of the firemen who had responded to the scene had done so.

Munford Police Department Officer Lucas Young, who responded to the call of a motor vehicle crash on Beaver Road on December 1, 2018, testified that he arrived on the scene approximately four or five minutes after receiving the call. When he arrived, he observed the victim lying next to a "T-post for barbed wire fencing" and a "truck off in a distance that was collided into a tree." Sergeant Darren Flake, who also responded to the scene, went to the victim while Officer Young went to the truck. As he approached the truck, a Ford F-250 pickup truck, he observed "a white male standing outside." The truck, which was "between 50 to 75 yards off the roadway across the driveway" of a residence, "had hit the tree and pretty much the whole front end was caved in from the tree." The truck had come to rest on the same side of the road where the victim lay.

Officer Young testified that he activated his body camera as he walked toward the truck. The defendant, who was seated in the driver's seat of the truck, "looked distraught, shaken up. He had glossy, bloodshot eyes, real bad slurred speech." Officer Young testified that, based upon his experience, he believed the defendant to be intoxicated. Officer Young smelled beer and observed "[a]n open beer can poured out" inside the defendant's truck. When Officer Young asked the defendant about the beer, the defendant "grabbed it and put it . . . under his seat." Upon searching the defendant's vehicle, Officer Young found "[t]hree unopened Natural Light cans in a 12-pack that was still cold." Officer Young asked the defendant to perform a field sobriety test, but he refused. The defendant was then transported to the hospital by ambulance.

Footage from Officer Young's body camera captured his interaction with the defendant, including the drawing of the defendant's blood at the scene, and was exhibited to his testimony and played for the jury. Officer Young testified that after the defendant's blood was collected, it was secured in a locked compartment at the police department before being sent to the Tennessee Bureau of Investigation ("TBI") for testing.

-3-

Paramedic Michael Carter testified that he drew blood from the driver of the pickup truck and then transported him to the hospital. During cross-examination, Mr. Carter said that he could not recall the specifics of the blood draw, but he maintained that if the defendant had refused, "I wouldn't have stuck him." He recalled that an officer rode in the ambulance with the defendant.

Munford Fire Department Lieutenant Bradley Jacobs, who worked as an emergency medical technician and fire fighter, also responded to the scene. When he arrived, he observed the victim lying "in the ditch." "When we arrived, she was deceased." He and other first responders covered the victim with a tarp and then went to check on the driver of the truck. Lieutenant Jacobs testified that "there was a strong smell of alcohol coming from the" driver and that he "seemed very disoriented, confused, fumbling through papers, couldn't recall what had happened." It was his opinion that the defendant was intoxicated. Lieutenant Jacobs observed a "12 pack of Natural Light beer in the passenger seat" that "had two full cans left in there." He recalled that the driver "complained of chest pains, likely from the seat belt grabbing him."

Munford Police Department Sergeant Darren Flake, who also responded to the scene, testified that when he arrived, he "observed there was a female that was over on the east side . . . off the roadway there that wasn't moving or anything." The victim, whose "leg was pretty mangled up" also "had lacerations on her head and face." She was unresponsive. A motorcycle with obvious damage lay in "a crash lane right into her vicinity as well." After learning that the victim was dead, Sergeant Flake telephoned his supervisor and then went to speak with Mr. Stimpson.

After speaking with Mr. Stimpson, Sergeant Flake approached the driver of the "white pickup truck off in a yard that had struck a tree" "[t]o the north of where" the victim lay. He recalled that the truck "had an odorant of beer that had spilled in the console down onto the floorboard there." He observed "a partially opened case of beer. There was probable three, maybe four cans left out of a 12 pack." Video footage from Sergeant Flake's body camera was exhibited to his testimony and played for the jury.

As he explored the scene, Sergeant Flake observed tire tracks in the area where Mr. Stimpson indicated that the truck had left the roadway. He also "observed vehicle parts in the southbound lane" and "parts of bodies that were l[]ying on the southbound side of the road." He said that he walked the northbound side of the roadway but did not observe any debris.

Munford Police Department Detective Daniel Hamm responded to the scene of the collision "after 10:00 p.m." on December 1, 2018. When he arrived, both the defendant's truck and the victim's motorcycle were still on the scene, as was the victim's

body. The defendant had been transported to the hospital. Detective Hamm photographed the scene. Later, he photographed the search of the defendant's truck at the impound lot. Detective Hamm obtained a warrant to seize "what they call the first draw" of the defendant's blood from the hospital. He obtained the sample and took it to the TBI for testing.

Detective Hamm and another detective interviewed the defendant at the Tipton County Sheriff's Office on December 5, 2018. The defendant admitted having purchased beer before the accident and having consumed two before getting in the truck to leave. He also admitted that he had "opened one up on my way home." He claimed that the victim "seemed like she was in my lane until I was in the ditch, and we still hit. I don't know much more of what I can do. She hit me on the front side of the driver's truck." The defendant claimed that he intended to check on the victim after he crashed into the tree, "but I met the Munford cop, he was coming up to my truck."

Munford Police Department Detective Geoffrey Daly testified that he participated in the investigation into the collision that resulted in the victim's death. Detective Daly, who had been certified in motor vehicle accident investigation and who had decades of experience in the repair and maintenance of motor vehicles, testified that he "walked the patterns" at the scene "to see where everything was at." "[A]t that point, I could visually see where my starting point was, where the vehicle went off the roadway." That point, he said, was marked by "tire tracks in the dirt." He said that he examined "the pattern that's in the dirt of the tire" and "followed the evidence where it comes back up on the roadway." He then compared that pattern to "the tire on the vehicle, and could tell it was the same tread pattern." Detective Daly prepared a diagram of the accident scene that was exhibited to his testimony.

Based upon his investigation at the scene, Detective Daly determined that the defendant's "vehicle was traveling north" when it left the roadway on the northbound side and then returned to the roadway before crossing into the southbound lane. The defendant's truck then struck the victim's motorcycle, creating "a debris field" in the southbound lane. He determined that the point of impact occurred in the southbound lane from observing gouge marks in the pavement made by the motorcycle's gear shifter.

Detective Daly examined the victim's motorcycle and observed that "[m]ost of the damage is on the left side of that bike, left front, left side." He also examined the helmet the victim had been wearing at the time of the crash and determined that "that's where the mirror on the vehicle had hit that helmet." Upon examining the defendant's truck, he observed damage to the driver's side mirror that aligned with debris discovered in the roadway near the centerline. He also observed "paint transfer from the bike." Inside the truck, he saw "approximately three cans of beer in a box [on the] passenger seat and

then a straw hat where the airbag deployed." The impact of the truck against the tree was so severe that the "floor buckled, causing" the bolts that held the seats to the floor "to break and the seat come up." The truck sustained heavy damage on the driver's side that was from the impact of the motorcycle.

Tipton County Medical Examiner Doctor Buffy J. Cook testified that he first examined the victim at the scene of the collision. Upon arriving, Doctor Cook "investigate[d] the scene" "to reconstruct from the accident, what happened." He then turned his attention to the victim, who "had multiple blunt force injuries" as well as the "traumatic amputation of her left foot" and "multiple severe fractures of the left side of her body." Doctor Cook requested an autopsy, which was performed at the West Tennessee Regional Forensic Center in Memphis. The autopsy listed the victim's cause of death as "[m]ultiple blunt force injuries" and the manner of her death as "accident." The autopsy report indicated that the victim suffered numerous abrasions, lacerations, and contusions. The victim also suffered "[m]ultiple fractures of the skull with the front part of the brain actually being pulpified, which means, basically, just ground to a pulp" and fractures to her left collarbone, left first rib, which perforated her lung, in addition to her left humerus, radius, wrist, femur, patella, tibia, fibula, and ankle. The victim suffered "very little" injury to the right side of her body. Toxicological testing of the victim's blood established the presence of pseudoephedrine at a therapeutic level. It also established the presence of methamphetamine, but Doctor Cook explained that the amount in the victim's blood could have been caused by the use of decongestants. He said that "whatever toxicology finding is here had no bearing upon what actually resulted in [the victim's] death."

During cross-examination, Doctor Cook agreed that methamphetamine ingestion could cause irrational or aggressive behavior but said that nothing indicated that the victim had acted irrationally or aggressively so as to cause the collision. Instead, Doctor Cook testified, all the evidence at the scene supported a conclusion that the defendant drove into the victim's lane of travel and struck her on her motorcycle. He emphasized that he arrived at that conclusion "based upon the overwhelming evidence on the autopsy and what I saw at the scene."

TBI Special Agent and Forensic Scientist Julian Conyers testified that she performed forensic testing on the sample of the defendant's blood obtained at the scene immediately after the accident. Her analysis established the defendant's BAC at that point to be .211 percent. Agent Conyers also analyzed the sample of the defendant's blood obtained at the hospital and determined his BAC at that point to be .23 percent.

The State rested, and the defendant elected to testify.

The defendant testified that he was on his way home after working on a friend's tractor when he saw "the motorcycles coming" toward him. He said that "the motorcycle that was on the left-hand side on the yellow line was actually on my side of the road," so he "got over to the right some." The defendant stated that, as he got closer to the motorcycles, the motorcycle continued to get closer to his lane of travel, "[s]o I run off the road on the right-hand side of the road to try to miss the motorcycle. And she sideswiped me." He said that they "collided and she went to the left or to the other side of the road and I traveled down the road, come back across the road and hit the tree in the yard." The defendant insisted that the victim was in his lane of travel when the accident occurred.

During cross-examination, the defendant admitted that he told Officer Young that he had not been drinking despite the fact that he had. He also admitted that there was beer in the can "in the dash thing" but insisted that "it was from earlier that day." The defendant claimed that he had consumed only three beers from the pack of 12 and that he had consumed those "between 1:00 and 2:00 p.m.," hours before the crash. The defendant insisted that the victim had maneuvered her motorcycle into his lane of travel and struck him "when I was on the right side of the road in the ditch." The defendant said that he was "not sure" if his insurance coverage "was current or not" at the time of the accident.

Based upon this evidence, the jury convicted the defendant of vehicular homicide by having a BAC of .08 percent or more, vehicular homicide by intoxication, vehicular homicide by reckless conduct, and violating the financial responsibility law.

At a bifurcated proceeding, the defendant acknowledged that he had two or more prior convictions of DUI and that his BAC at the time of the crash was .20 percent or more. Based upon the evidence presented during the bifurcated proceeding, the jury found the defendant guilty of aggravated vehicular homicide by having a BAC of .20 percent or more and that he had two or more previous convictions of DUI.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the evidence supporting his conviction of aggravated vehicular homicide, arguing that the evidence was insufficient to establish that his intoxication was the proximate cause of the collision that resulted in the victim's death.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331

S.W.3d at 379.  The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  *Id.*

> As charged in this case,
>
> [v]ehicular homicide is the reckless killing of another by the operation of an automobile . . . as the proximate result of:
>
> (1) Conduct creating a substantial risk of death or serious bodily injury to a person; [or]
>
> (2) The driver's intoxication, as set forth in § 55-10-401 . . . . For the purposes of this section, "intoxication" includes alcohol intoxication as defined by § 55-10-411(a), drug intoxication, or both;

T.C.A. § 39-13-213(a)(1), (2).  "Aggravated vehicular homicide is vehicular homicide" committed by a defendant who "has two (2) or more prior convictions for" DUI or whose BAC is "twenty-hundredths of one percent (0.20%), or more . . . and the defendant has one (1) prior conviction for" DUI.  *Id.* § 39-13-218(a)(1)(A), (3)(A).

"Regarding the proximate cause inquiry," our supreme court has "adopted a three-pronged test": (1) the "conduct must have been a 'substantial factor' in bringing about the harm being complained of;" (2) "there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm;" and (3) "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence."  *Wilson v. Americare Sys.*, 397 S.W.3d 552, 558 (Tenn. 2013) (citing *Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn. 2005)).  Our supreme court has explained:

> "Causation (or cause in fact) is a very different concept from that of proximate cause.  Causation refers to the cause and effect relationship between the tortious conduct and the injury.  The doctrine of proximate cause encompasses the whole panoply of rules that may deny liability for otherwise actionable causes of harm."  Thus, proximate cause, or legal cause, concerns a determination of whether legal liability

should be imposed where cause in fact has been established. "Cause in fact, on the other hand, deals with the 'but for' consequences of an act. 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct.'"

*Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993) (citations omitted).

The State conclusively established that the cause in fact of the victim's death was the injuries she sustained after being struck by the defendant's vehicle. The evidence, viewed in the light most favorable to the State, established that the defendant drove erratically, swerving off of the roadway and then into the oncoming lane of traffic, where he encountered the Stimpsons. The victim sustained injuries primarily to the left side of her body, and the majority of the debris field was located in her lane of travel. Any inconsistencies with regard to which particular part of the motorcycle caused which mark on the roadway were resolved by the jury, as the final judge of the facts and the law. The evidence also established that the defendant had slurred speech, a stumbling gait, and the aroma of an intoxicating beverage. Indeed, a half-consumed beer, still cold, was found inside the truck along with a partially-emptied 12-pack of beer. The defendant's BAC exceeded the .20 percent threshold. This evidence was more than sufficient to establish the defendant's intoxication as the proximate cause of the victim's death.

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CUROOD WITT, JR., JUDGE